Kemp v. Small.

J. J. Kemp et al., appellants, v. J. W. Small et al., appellees.

[Filed June 30, 1891.]

1. **Mortgage**: Deed for Security Construed As. An absolute deed of real estate, or a bill of sale of personal property absolute on its face, executed and intended as security for a debt or loan, will be construed as a mortgage as between the parties thereto, and all others, except *bona fide* purchasers for value without notice.

2. ——: ——. *Held*, That the deeds and bill of sale, referred to in the opinion, were given as security and were not intended as an absolute transfer of the property therein described.

3. **Trustee**: Rents and Profits. *Held*, That M. is liable for the net rents and profits of the real property while in his possession.

Appeal from the district court for Clay county. Heard below before Morris, J.

*France & Harlan*, *S. W. Christy*, and *Robert Ryan*, for appellants, cited: *Kansas Mfg. Co. v. Gandy*, 11 Neb., 450; *Lininger v. Herron*, 23 Id., 199, 200; Bump, Fraud. Con., 25, and citations; *McKibbin v. Martin*, 64 Pa. St., 356; *Humphries v. Freeman*, 22 Tex., 45; *Connelly v. Walker*, 45 Pa. St., 449; *Bentz v. Rockey*, 69 Id., 76; *White v. Graves*, 7 J. J. Marsh. [Ky.], 523; *Kissam v. Edmondston*, 1 Ired. Eq. [N. Car.], 180; *Garland v. Rives*, 4 Randolph [Va.], 282; *Swinford v. Rogers*, 23 Cal., 234; *Fullerton v. Viall*, 42 How. Pr. [N. Y.], 294; *Byrant v. Young*, 21 Ala., 264; *Schmidt v. Opie*, 33 N. J. Eq., 138; *Sands v. Codwise*, 4 Johns. [N. Y.], 536; *Van Winkle v. Smith*, 26 Miss., 491; *How v. Camp*, Walker's Ch. [Mich.], 427; *Jones v. Reeder*, 22 Ind., 111; *Smith v. Sands*, 17 Neb., 498; *Riggs v. Murray*, 2 Johns. Ch. [N. Y.], 565; *Halbert v. Grant*, 4 B. Mon. [Ky.], 585, and cases.

*John L. Epperson*, on the same side, cited: Brandt, Suretyship, sec. 9, and citations: *Kansas Mfg. Co. v. Gandy*, 11 Neb., 448; *Martin v. Stubbings*, 20 Ill. App., 392; *Stevenson v. Craig*, 12 Neb., 469; *Denison v. Gibson*, 24 Mich., 187; *Wheelwright v. De Peyster*, 4 Edw. Ch. [N. Y.], 232; *Loomer v. Wheelwright*, 3 Sandf. Ch. [N. Y.], 135; *Wilcox v. Todd*, 64 Mo., 388; *Purvis v. Carstaphan*, 73 N. Car., 575; *Hanford v. Bockee*, 20 N. J. Eq., 101; *Agnew v. Merritt*, 10 Minn., 308; *Wallace v. Hudson*, 37 Tex., 456; *Wolf v. Banning*, 3 Minn., 202; *Spear v. Ward*, 20 Cal., 659; *Neimcewicz v. Gahn*, 3 Paige Ch. [N. Y.], 614; 11 Wend. [N. Y.], 312; *Knight v. Whitehead*, 26 Miss., 245; *Vartie v. Underwood*, 18 Barb. [N. Y.], 561; *Smith v. Townsend*, 25 N. Y., 479; *Bank of Albion v. Burns*, 46 Id., 170; *Burr v. Boyer*, 2 Neb., 265; *Schroepell v. Shaso*, 3 N. Y., 457; *Hayes v. Ward*, 4 Johns. Ch. [N. Y.], 130; *Smith v. Tunno*, 1 McCord [S. Car.], 443; notes to *Rees v. Berrington*, 2 Vesey [Eng.], 540; *Pledge v. Buss*, Johnson [Eng. Ch.], 663; *McCollum v. Hinckley*, 9 Vt., 143; *Leffingwell v. Freyer*, 21 Wis., 393.

*Chas. O. Whedon*, for appellee Mosher, cited: *Harkins v. Bailey*, 48 Ala., 376; *Elwood v. May Bros.*, 24 Neb., 373; *Davis v. Scott*, 22 Id., 154; *Deitrich v. Hutchinson*, 20 Id., 52; *Covanhovan v. Hart*, 21 Pa. St., 495; *York Co. Bank v. Carter*, 38 Id., 446; *Lininger v. Raymond*, 12 Neb., 19; *Grimes v. Farrington*, 19 Id., 44; *Nelson v. Garey*, 15 Id., 531; *Bierbower v. Polk*, 17 Id., 268; *Grant v. Cropsey*, 8 Id., 208; *Newman v. Mueller*, 16 Id., 527; *Betts v. Sims*, 25 Id., 181.

NORVAL, J.

The plaintiffs, John J. Kemp and Abijah S. Sherwood, brought an action in the nature of a creditor's bill, in the district court of Clay county, against James W. Small,

Mary A. Small, Charles W. Mosher and Louise P. Mosher. The plaintiffs are judgment creditors of the defendant, James W. Small, and seek to subject certain real estate, conveyed by the Smalls to the defendant Charles W. Mosher, to the payment of their judgments, claiming that said conveyances were made for the purpose of hindering, defrauding, and delaying the plaintiffs and other creditors of said James W. Small.

Petitions of intervention were filed by the Peoria National Bank, J. S. Townsend, J. B. Massie, W. R. Stevens, A. H. Andrews & Co., Diebold Safe and Lock Co., Charles B. Day, J. P. Johnson, William S. Richardson, Lowell C. Lloyd, York College, Josiah Poffenbarger, Mary A. Small, and Howard Brothers & Co., setting up their several judgments and join the plaintiffs in asking that the conveyances to Mosher be set aside and the land subjected to the payment of their judgments.

The defendant Mary A. Small also filed a cross-petition, in which she prays for the cancellation of certain notes and mortgages and a warranty deed executed and delivered by her to Charles W. Mosher upon real estate owned and held by her in her own right, upon the ground that said notes, mortgages, and deed were made, executed, and delivered without any consideration therefor.

The defendant Charles W. Mosher filed answers to the petitions of the plaintiffs, and to the cross-petition of the defendants. The pleadings are too lengthy to be set out in full, or to give even a synopsis thereof in this opinion.

The district court made findings of fact and law, and rendered a decree dismissing the petition of the plaintiffs, the cross-petition of Mary A. Small, and the cross-petitions of the several intervenors, and ordered that certain notes, aggregating the sum of $20,000, executed May 29, 1886, by James W. and Mary A. Small to Charles W. Mosher, be canceled and surrendered up to them, and the title to the real estate conveyed by the Smalls to Mosher be quieted in him.

The plaintiff Mary A. Small and the intervenors appeal.

Mary A. Small is the wife of the defendant James W. Small, and Louise P. Mosher is the wife of the defendant Charles W. Mosher. On and prior to the 29th day of May, 1886, James W. Small was engaged in business as banker, stock raiser, and trader, and, in the transaction of his business, accumulated a large amount of real and personal property, and contracted debts exceeding his assets. On said date he was indebted to the Capital National Bank of Lincoln in the sum of $30,250; to the Adams County Savings Bank in the sum of $10,833.73; to the First National Bank of Hastings in the sum of $508.09, and to the Omaha National Bank in the sum of $7,309.17, which indebtedness was secured by mortgages on his real estate and personal property. He was also indebted to unsecured creditors from $35,000 to $40,000.

A few days prior to the 28th day of May, 1886, the Adams County Savings Bank took possession of the live stock owned by Small, and covered by its chattel mortgage, for the purpose of foreclosure. On the last named date Mosher, who was president of the Capital National Bank, went to Hastings to look after the indebtedness of Small to that bank. The negotiations between Small and Mosher resulted in the making of the following contract:

"This agreement, made this 29th day of May, 1886, between James W. Small and Charles W. Mosher, witnesseth:

"Whereas, said Small is largely indebted to the Omaha National Bank, of Omaha, Nebraska; to the First National Bank of Hastings, Nebraska; to William Kerr, of Hastings, Nebraska; to the Adams County Savings Bank, of Hastings, Nebraska, and to the Capital National Bank, of Lincoln, Nebraska; and

"Whereas, said Small, in order to secure said indebtedness to said several corporations and firms, has heretofore mortgaged and pledged to them all the property hereinafter mentioned; and

23

"Whereas, said property, if sold under mortgage fore-closure, would not probably pay said Small's indebtedness to said above named creditors, and the interest on said debts and the cost of such sales; now,

"Therefore, in consideration of the premises above set forth and in consideration of the promises and agreements of said Charles W. Mosher hereinafter set forth, I, the said James W. Small, do hereby grant, bargain, sell, convey, set over, and transfer and deliver to the said Charles W. Mosher all the following personal property, goods, chattels, and choses in action, rights and chattels, to-wit:

"One brown Norman stallion named 'Favort'; one English bay draft stallion named 'Merry Lad'; one Norman gray stallion, named 'Coco'; one bay Norman stallion named 'Nicolete'; one gray Norman stallion named 'Rapide'; one Belgian gray draft stallion named 'Lincoln'; one grade bay Norman stallion named 'Drury'; one bay Hambletonian stallion named 'Summit'; one black Bashaw and McGregor stallion named 'Butie McGregor'; one black traveling stallion named 'Deadwood'; one bay traveling gelding named 'Clay'; one sorrel traveling gelding named 'Little Fred'; two bay mare ponies about four years old; two chestnut-sorrel mare ponies, about four years old; one light-sorrel mare pony, five years old; one black imported Norman mare named 'Unico'; one brown grade Norman mare, six years old; one brown mare twelve years old named 'Single Footer'; one iron-gray imported Norman stallion named 'Raven.' All above stock now in barn formerly used by James W. Small, at Fairfield, Nebraska.

"Lot II—One gray imported Norman stallion named 'Rustique,' now on stand at Inland, Nebraska.

"Lot III—One imported Norman stallion named 'Lorris,' now on stand at Edgar, Nebraska, in hands of W. E. Sturgis.

"Lot IV—One imported gray Norman stallion named

'Le Consul,' and one bay Clydesdale stallion named 'Donald Dinnie,' both now on stand at Blue Hill, Nebraska, in hands of E. H. Busby.

"Lot V—One gray imported Norman stallion named 'Blue Cloud,' now on stand at Red Cloud, Nebraska, in hands of J. B. Burby.

"Lot VI—One imported Norman stallion named 'Fidele,' and one black Norman stallion named 'Koloma,' both on stand at Franklin, Nebraska, in hands of E. P. Rice.

"Lot VII—One black imported Norman stallion named 'Javelin,' now on stand at farm on S. E. quarter of 15, and N. E. 22, township 5, range 8, Clay county, Nebraska.

"Lot VIII—One gray imported Norman mare named 'Surprise'; one full-blooded Norman horse colt, nine months old (colt of 'Surprise'); one bay trotting mare, white face, twelve years old, named 'Beauty'; one sorrel trotting mare (and sucking colt), six years old; one black mare, nine years old, named "Black Nell"; one bay mare, blind, named 'Lucy'; one bay gelding, three years old, named 'Pilot'; one black gelding, two years old, named 'Golddust'; one sorrel horse pony, five years old; one bay mare, eight years old, named 'Fannie'; two sorrel work mares, nine years old, named 'Polly' and 'Fattie'; one bald-faced mare, eight years old, named 'Baldie'; one roan mare, ten years old named 'Fan'; one bay pony mare, four years old, named 'Pet'; one roan pony mare with bald face, four years old, named 'Baldie'; four black yearling ponies; one iron-gray yearling pony; one red roan mare colt, one year old; twenty-two head of cows; undivided half interest in seven yearling heifers; one Short-horn bull, one year old; undivided one-half interest in twenty-three two-year-old steers; undivided one-half interest in nineteen yearling steers; undivided one-half interest in twenty-two head spring calves; thirty head of breeding sows; two boars, one and two years old; fifteen stock hogs and an undivided

half interest in forty fat hogs ready for market; and an undivided one-half interest in one hundred and fifty spring pigs; and an undivided one-half interest in ten breeding sows. All last above lot of property now on farm on S. W. quarter of 14, and W. one-half of 23–5–7, Clay county, Nebraska, in hands of J. W. McReynolds.

"Lot IX—One gray mare, three years old, named 'Lucy'; one gray mare, three years old, named 'Laura'; one brown mare, three years old, named 'Pansy'; one light-bay mare, two years old, named 'Fanny'; one black mare, three years old, named 'Coley'; one brown mare, eight years old, named 'Fannie'; one brown mare, six years old, named 'Straight Leg'; one black mare, seven years old, named 'Pet'; one black mare, nine years old, named 'Laura'; one bay Clydesdale mare, five years old; one sorrel gelding, three years old, named 'Prince'; one sorrel gelding, four years old, named 'Jerry'; one sorrel gelding, five years old, named 'Fred'; forty-three Texas mare ponies, from three to six years old; six cows; one Short-horn bull, one year old; one bull calf, six months old; an undivided one-half interest in two spring calves; an undivided one-half interest in eighty-five hogs, from one to three years old, and twenty-one spring pigs. All above lot of property on farm on S. E. quarter 15 and 22, and N. E. 22–5–8, in charge of H. B. Kirkpatrick.

"Lot X—One roan Short-horn bull, three years old; one roan Short-horn bull, two years old; forty-two cows from two to six years old, and undivided half of fourteen yearlings and seventeen sucking calves; twenty-five head of brood sows, and an undivided half of twenty-five stock hogs and ten pigs. All above lot of property on farm now occupied by James Bainter, on sec. 8–5–8, near Spring Ranch, Clay county, Nebraska, including one-half interest in one hundred and fifty spring pigs, and one-half interest in ten breeding sows, all last on farm.

"And I, the said Charles W. Mosher, in consideration

of the sale and delivery to me of said above described property, do hereby promise the said Small that I will assume and pay off and discharge all his said indebtedness to said Omaha National Bank, First National Bank, Adams County Savings Bank, Capital National Bank of Lincoln, Nebraska, and William Kerr, and save and keep harmless the said Small from the claims of each and all of said creditors.

"This bill of sale is meant to and does include all debts due or to become due said Small from any and all persons for the services of any stallion above named; and all notes taken for such services, not already transferred by said Small, are also included herein, and is meant and intended to operate as a sale and transfer of any and all collateral securities of whatever kind and description now held by either or any and all said creditors.

"In witness whereof, said James W. Small has signed and delivered, and said Charles W. Mosher has accepted, the foregoing instrument.

"(Signed)                    JAMES W. SMALL.
                         " CHAS. W. MOSHER.

"In presence of JOHN M. RAGAN."

It appears from the testimony that it was the understanding of Small and Mosher, when the above contract was signed, that Small was to convey to Mosher 1,280 acres of land owned by him in Nuckolls county, and that Mary A. Small should convey to Mosher 1,040 acres of land owned by her and situate in Clay county.

On the morning of May 29th, Mosher and Small went to Fairfield, the home of the Smalls, where, on the same day, deeds were made out and delivered conveying to Mosher the Clay and Nuckolls county lands. Said real estate, at the time of said conveyances, was incumbered in the sum of over $12,000 by first mortgages and outstanding contracts for unpaid purchase moneys. The indebtedness of Small to the Capital National Bank, Adams County

Savings Bank, First National Bank of Hastings, and Omaha National Bank, above referred to, was likewise secured by mortages on the real estate conveyed to Mosher.

On May 29, but prior to the making of the deeds to Mosher, the Smalls executed to Mosher notes aggregating $20,000, due in five years, and secured their payment by mortgages on the real estate conveyed to Mosher. The mortgages and notes were given for the purpose of being negotiated by Mosher, the proceeds to be applied to pay off prior liens on the land. The mortgages were recorded, but have never been negotiated. Mosher took immediate possession of the personal property, and sold the larger part of the same. A part remains unsold. From the sales of the personal property the evidence shows he has received in cash $6,533.72, and in notes $7,791.17. Mosher also received numerous collateral notes, their face value being somewhere between $20,000 and $30,000; their real value being much less. What amount of the notes is collectible it is difficult to tell. There was considerable conflict in the testimony as to the value of the real and personal property when the conveyances were made, the difference between the highest and the lowest estimates of the witnesses being several thousand dollars. It cannot be doubted that Small was hopelessly insolvent. It also appears that Mosher has paid the debts which he assumed of Small's, amounting to $48,900.09; that he has paid $4,100 upon the first mortgages upon the lands conveyed to him; that he has paid $2,534.70, as the balance of the purchase price of a portion of the lands conveyed to him by Mrs. Small; and has paid the taxes on the property. The total amount paid by Mosher, exclusive of expenses, is over $55,000. There remains unpaid a first mortgage on the lands of the amount of $5,000.

Was the conveyance of the land without consideration? Counsel for appellants contends that the deeds were upon no new undertaking, and hence the conveyances were void.

In compensation for the making of the deeds and the transfer of the personal property owned by J. W. Small, Mosher promised to pay nearly $49,000 of Small's debts, to certain specified creditors, whose claims were secured by mortgages on the property conveyed. The promise to pay these claims was ample consideration for the deeds. That Mosher has kept his undertaking, by paying all the claims assumed, is not questioned. But it is urged that Mosher undertook to pay the debts solely in consideration of the transfer to him of the personal property described in the written contract or bill of sale. It is so written in the agreement, and if it were true that the making of the deeds and the transfer of the personalty were separate and distinct transactions, then, we grant, the position of the appellants would be unanswerable. While the agreement relating to the personal property was prepared prior to the execution and delivery of the deeds, the evidence clearly shows that the whole business was one transaction. It was definitely understood between Small and Mosher when the written agreement was drawn, that the lands in Clay and Nuckolls counties owned by Mr. and Mrs. Small should also be deeded to Mosher. In pursuance of that understanding, after the agreement was drawn, Small, Mosher, and J. M. Ragan went to Fairfield to see Mrs. Small, and to get her consent to the arrangement, as she owned in her own right, a part of the lands. Mr. Ragan, after testifying as to the negotiations between Small and Mosher at Hastings, testified as follows: "We then went down to Fairfield to see Mrs. Small, and see what she said about it. On the morning of the 29th, in Small's bank, Mr. Small went over and got his wife and explained it to her, and I asked her if she understood it. She said yes, her husband had told her all about it. I then explained to her that Mr. Small would turn over his personal property to Mr. Mosher to secure and pay off his indebtedness against it, and that Mosher would assume the indebtedness

of Kerr, of the Adams County Savings Bank, the First National Bank of Hastings, the Omaha National Bank, the Capital National Bank, so as not to have the property sacrificed, and that Mr. Small agreed that she should consent that the land in her name should also be deeded to Mosher as security for this indebtedness, as it was known the personal property would not pay it all, and that, after paying these debts and the expenses, he would return the surplus to her, Mrs. Small, in consideration of putting in her lands. She expressed herself as entirely satisfied with that arrangement, and the thing was done."

This testimony is supported by that of Mr. Mosher, and is corroborated by all the circumstances surrounding the transaction. It was not reasonable to suppose that Mosher, or any one else, would assume an indebtedness of more than $48,000 for the transfer of personal property conceded to be worth less than two-thirds that sum. That the written agreement was made prior to the execution of the deeds can make no difference, so long as it was a part of the same transaction, as the evidence before us shows it to be. There is not the slightest foundation for the charge that the conveyances were made to Mosher for the purpose of defrauding or delaying the unsecured creditors of James W. Small. No inference, or even suspicion of fraud, can be drawn from the testimony. Mr. Small, at the time, owed the Capital National Bank of Lincoln, of which Mr. Mosher was president, over $30,000, to secure which the bank held mortgages on the property subsequently covered by the deeds and bill of sale. Other creditors of Small were likewise secured on the same property. The debts were past due, and one of the creditors was proceeding to foreclose, and to that end had taken possession of the personal property. To prevent a forced sale and sacrifice of the property, Mosher agreed to advance the money to pay off the liens upon the property, and as security the deeds and bill of sale were made. So far as we can see, all the parties were

prompted by the best of motives.    While the transaction resulted in a portion of the creditors being paid in full, and others receiving nothing, that does not make it fraudulent in law.    It is well settled in this state that it is competent for a debtor to pay or secure one or more of his creditors to the exclusion of others, where the transaction is not tainted with any fraudulent intent.

The trial court found that the deeds for the lands and the bill of sale of the personalty, conveyed the full legal title to the property to Mosher, and that he is entitled to have the title to the real estate quieted in him.    We think the learned judge reached a wrong conclusion.    While each of the deeds and bill of sale is absolute on its face, and purports to convey the full legal title to the property therein described, the proof falls far short of establishing that it was the intention and purpose of the parties to convey to Mosher an absolute legal estate, but on the other hand the evidence conclusively shows, at least to our mind, that the conveyances were intended by all the parties as mortgages to secure the indebtedness of Mr. Small to Mosher, or his bank, and also to secure Mosher for all moneys he should advance to pay off the other liens upon the property.    Mr. Mosher, after testifying to having met Mr. Small at Hastings on May 28, states:

"We figured up what Mr. Small owned of this property in his own name, and we didn't make enough to pay this liability.    These mortgages also covered the land that was in the name of Mrs. Small, and after talking the matter over *pro* and *con*, discussing the best way to get the most money out of this property for myself and other parties holding mortgages, I finally made Mr. Small a proposition that I would buy this property covered by the mortgages and the liens against it, providing he would deed—he and Mrs. Small would deed—to me the land, and that he would give me peaceable possession of the chattel property, with a distinct and positive understanding that I was to take no

property except what had been pledged or already mortgaged to pay the debts that I assumed to pay.    Mr. Small then stated that if his wife would turn this property over to pay his debts and there happened to be a surplus after paying these debts, these mortgages and prior incumbrances and the expense of disposing of this property, that I would turn it over to Mrs. Small.    This I agreed to do, as I only wanted to get my money and did not expect to make anything out of the purchase of this property.    I also at the time made another proposition to Mr. Small, that at any time within a reasonable time that he, Small, or any of his creditors were dissatisfied with this transaction, that I would sell them my claim and turn them over this property, upon a small cash payment down, and give him five years at six per cent interest to pay the balance in, as I didn't want to feel, or have any one else to feel, that I was trying to get anything except the money due me.    We finally wrote a proposition down that evening and it was agreed to, and Mr. Small and I signed it. Next morning we went to Fairfield, Mr. Small went up to his house and brought his wife down to the bank.    There were present at the bank, Mr. Ragan, Mr. Lewis, Mr. Small, Mrs. Small, and myself; Mr. Ragan, Mr. Small, and Mrs. Small went to a little room back in the office connected with the bank, and, as I understood, talked over the proposition of mine with Mrs. Small, *pro* and *con*, and finally Mrs. Small came out and stated that she was perfectly willing that the deal should be consummated. We then went ahead and drew up these mortgages and deeds and they were executed.    Before Mrs. Small and Mr. Small would hand them over after their execution, they wanted further witness to the fact that I would turn over this property to Mrs. Small that would be left after the payment of my claim; so Mr. Lewis came up so he could swear to the agreement in case of any trouble in the future. The proposition was stated to him and then everything

was pronounced satisfactory, and the paper and the deeds were delivered to me. ' We then all drove over to Clay Center and put the mortgages and deeds on record. From there we went to Harvard and from there to Hastings. Mr. Ragan then took 'this agreement that had been signed by Mr. Small and myself and instructed one of his clerks to make three copies of it on the typewriter, one for myself, one for Mr. Small, and one for himself, and I believe 'this is the triplicate as per the original agreement, and mailed to me within a week or ten days."

The testimony of Mr. Ragan, which we have already quoted, is to the same effect. The purport of Mrs. Small's testimony is that the property was turned over solely to secure her husband's debts. The only reasonable conclusion to be drawn from the testimony is, that the conveyances were intended solely as security, and not as an absolute transfer of the property. Mr. Mosher's promise to return the surplus, if any there might be, after satisfying the indebtedness, is entirely inconsistent with the theory that he became the absolute owner of the property. The conveyances were not made to Mosher in trust for any one, and no secret trust in respect to the property was created or intended. The instruments executed by the Smalls to Mosher were in effect mortgages. It is no longer an open question in this state that the aim and purpose for which a deed is made is open to inquiry, as between the parties to it, and all others, except a good faith purchaser without notice, and when by satisfactory evidence it is established that it was executed and intended as a security, in the nature of a mortgage, a court of equity will carry out the intention of the parties, by declaring it a mortgage. (*Wilson v. Richards*, 1 Neb., 342; *Schade v. Bessinger*, 3 Id., 140; *McHugh v. Smiley*, 17 Id., 626; *Newman v. Edwards*, 22 Id., 248; *Eiseman v. Gallagher*, 24 Id., 79.) Likewise a bill of sale, although absolute on its face, when designed as a mere security for a debt, will, as between the parties, be

treated as a chattel mortgage. (*Omaha Book Co. v. Sutherland*, 10 Neb., 334.)

We are unable to see how the unsecured creditors of Mr. Small lost anything by the transaction. The entire property was already mortgaged to secure the identical indebtedness assumed by Mosher, and afterwards paid off by him, at the solicitation of Mr. Small. Having paid off and satisfied these liens, Mosher was entitled to be subrogated to the rights of the lien-holders. It is evident that the unsecured creditors were not placed in any worse position by the conveyances executed by the Smalls to Mosher. While the deeds were absolute on their face, they did not withdraw the property from the reach of the unsecured creditors. They were not prevented from showing that the deeds were intended solely as mortgages.

It is urged by counsel for appellants, that the transfers were fraudulent as to creditors, because of the failure of Mosher to retain possession of the personal property. The evidence fails to show that Mr. Small retained possession thereof. Mr. Shellenbarger took charge of the property for Mr. Mosher, and managed it for him. He took the horses to Kearney, where they were advertised and sold, and the proceeds were turned over to Mr. Mosher. While Mr. Small was consulted in regard to the sale of the property, for the purpose of preventing its being sacrificed, it was not under his possession, management, or control.

The court below made no finding as to the rental value of the real estate. These omissions would not be material if Mosher was the absolute owner of the lands; but holding, as he did, the lands as security he must account for the value of the rents and profits thereof. It appears that the lands in Clay county were under leases for the period of five years at the time the deeds were made to Mosher. The net amount of rents Mosher has received from these lands, as well as the Nuckolls county land, he should account for. (*Comstock v. Michael*, 17 Neb., 288.)

It follows from the views which we have expressed that the decree of the district court, quieting the title to the real estate in Mosher, must be reversed, that an account must be taken of the amount due him for moneys paid out in discharging liens upon the property, and a decree of foreclosure and sale entered for the amount found due. The Nuckolls county lands to be first sold, and if insufficient to pay the amount due Mosher, then a sufficient quantity of the Clay county lands, which belong to Mrs. Small, be sold to make up the deficiency. The surplus, if any, arising from the sale of the property owned by Mr. Small, to be applied upon the claims of the appellants as judgment creditors.

A referee will be appointed to take the account and report his findings to the court. In taking the account, Mosher will be credited with the following amounts as found by the district court in the tenth finding to have been paid by Mosher, to-wit: Capital National Bank, $30,250, paid before January 1, 1887; Omaha National Bank, $7,309.17, paid July, 1886; Adams County Savings Bank, $3,833.73, paid July 4, 1886; Adams County Savings Bank, $3,500, August 21, 1886; Adams County Savings Bank, $3,500, September 1, 1886; First National Bank of Hastings, $508.09; Mr. Lombard on mortgage, $3,000; McKinley & Lanning on mortgage, $1,100; B. & M. R. R. Co., as part of purchase price of land held under contract by Mrs. Small, $1,334.70, paid July 9, 1886; Mrs. Lloyd, as part of purchase price of land, $1,200, paid May, 1887; with ten per cent interest upon each of said sums from the date the same was made, excepting the amount paid Mrs. Lloyd, which will be computed at eight per cent, and the amount paid the railroad company to be computed at seven per cent. Mr. Mosher will also be credited with whatever sums he has paid for taxes and insurance and expenses incurred in caring for and selling the personal property, with interest from the date

of such payment, at ten per cent, that being the rate of interest the claims bore which Mosher assumed and paid. If any part of the $5,000 incumbrance, which remained unpaid at the time of the trial in the court below, has since been paid by Mosher, he will be credited with the amount of such payment, with interest thereon.

The referee will charge Mosher with the amount of cash received and notes taken on the sales of personal property, the amounts collected on collateral notes, and the net rents and profits of the real estate, with ten per cent interest on each of said items from the date the same was received. Mosher will also be charged with the value of all personal property unsold, and collateral notes uncollected. Permission given the parties to introduce additional testimony before the referee, if they so desire. On the coming in of the report of the referee a decree will be entered in this court.

JUDGMENT ACCORDINGLY.

THE other judges concur.