362 F.2d 8
 In the Matter of BLACK RANCHES, INC., a Nebraska Corporation, Debtor.
Roe R. BLACK, Avis C. Black, Roe C. Black, Black Ranches, Inc., a Corporation, Debtor, and Thomas Hart Fisher, Appellants,
v.
Paul STRAND, Otto Lamprecht and Howard Thompson, Appellees.
 No. 17990.
 United States Court of Appeals Eighth Circuit.
 May 12, 1966.
 Motions to Amend and Petition for Rehearing Denied June 21, 1966.
 
 COPYRIGHT MATERIAL OMITTED Thomas Hart Fisher, Chicago, Ill., for appellants and on brief with E. H. Powell, Aurora, Neb.
 Raymond M. Crossman, Jr., of Crossman, Barton & Norris, Omaha, Neb., for appellees.
 Before MATTHES and GIBSON, Circuit Judges and HUNTER, District Judge.
 MATTHES, Circuit Judge.
 
 
 1
 This is one of four appeals from orders of the United States District Court for the District of Nebraska, entered on December 4, 1964, allowing and disallowing claims in the Black Ranches, Inc., Chapter X Bankruptcy proceeding.[1] All four appeals were submitted to this court March 8, 1966, on the printed record, briefs and oral arguments.[2] Judge Delehant, who presided over the trial of all of the claims which are the subject of these appeals, fully explored their merits and meticulously examined all of the contentions, as is demonstrated by his comprehensive memorandum opinion (unreported), filed on December 4, 1964, consisting of 274 typewritten pages, plus 75 footnotes, which, with deletions, comprises 269 printed pages of the record.
 
 
 2
 The basic issue for determination on this appeal, which involves claim No. 5, is whether the district court committed error in allowing it as a secured claim. Before consideration of this question, we give attention to background facts relevant to this and the other appeals. Black Ranches, Inc. (hereinafter sometimes referred to as "corporation" or "debtor"), was incorporated under the laws of Nebraska in August, 1949.[3] Shortly thereafter, Roe R. Black and Avis C. Black, husband and wife, became the record owners of all of the subscribed stock. In early 1952, the corporation was encountering financial problems. On approximately April 14, 1952, following meetings attended by some or all of the following persons: Roe R. Black, then the sole director and officer; one J. A. Cobbey; Marlon Brando (deceased since July 17, 1965); and, John M. Palmer, Black and his wife transferred all of their shares of stock to Cobbey. On the same day, Brando, Cobbey and Palmer were elected directors of the corporation and president, vice-president and treasurer, and secretary, respectively. The court found, however, and entered an order that: (1) Cobbey is, and throughout the pendency of the Chapter X proceeding has been, the owner of record of all of the shares of stock, but owns, and has owned, such shares of stock solely as trustee, to enable him to negotiate for the adjustment of the indebtedness of the corporation with its several creditors; (2) the Blacks and Thomas Hart Fisher are the sole owners of the equitable, or beneficial, title to all of the shares of stock in the corporation; (3) as between the Blacks, on one hand, and Cobbey, on the other, the Blacks are entitled, in this proceeding, to represent the debtor. This finding of the court is not an issue in any of the appeals.
 
 
 3
 Black Ranches first acquired title to the ranch land in October, 1949. Thereafter, it conveyed the property to Kenneth Van Nostrand, who in turn conveyed it to Roe R. Black. On May 7, 1951, the latter deeded the land to Black Ranches, "subject to all liens of record". On May 10, 1951, Roe R. Black reported to the corporation that it was the owner of 8,280 acres.
 
 
 4
 The financial plight of the corporation worsened and, on October 22, 1954, five of its creditors filed a petition in the United States District Court for the District of Nebraska for corporate reorganization under Chapter X of the Bankruptcy Act (11 U.S.C. Chapter X, §§ 501-676), praying, inter alia, for the appointment of a trustee for the corporation and its property.[4] On the day of its filing, the Court, Honorable James A. Donohoe (deceased since February 26, 1956), approved the petition for reorganization. This order was evidently regarded as permitting debtor to remain in possession of the ranch property. In any event, it was not until February 24, 1956, that Judge Delehant appointed Charles H. Rowan as a "limited" trustee to conserve the debtor's assets. On October 15, 1956, the court appointed Richard L. Berkheimer, an attorney, trustee for debtor and all of its property and assets. Rowan, upon filing of a satisfactory report, was discharged, and Berkheimer, having duly qualified, has been, and is, the trustee of debtor and its property.
 
 
 5
 Approximately 56 claims were filed. Of that number, 27 creditors failed to appear at the scheduled hearings. The court, finding that those creditors had abandoned their claims, disallowed them for "want of prosecution". Twenty-two claims have been allowed, all of which are unsecured, except claim No. 5, the subject of this appeal.[5] The protracted litigation, which terminated in the district court on entry of orders on December 4, 1964, was focused upon the claims of the appellants herein and of Marlon Brando, Marlon Brando, Jr., Denver United States National Bank, Roe R. Black and Thomas Hart Fisher.
 
 CLAIM NO. 5
 
 6
 The component parts of this claim, allowed in the sum of $95,107.73, are: (a) $69,913.72, due on a first mortgage; (b) $217.31, due on Nebraska State School land lease No. 67,550; (c) $51.70, for court costs incident to the foreclosure proceeding; and (d) $24,925, due on a second mortgage. Interest, at the appropriate rate, was allowed on each of the items, except the court costs. As security for $70,131.03 thereof, the court adjudged that appellees, as assignees, owned "the first and paramount mortgage lien" upon all of the owned ranch land of debtor in Brown and Blaine Counties, Nebraska, and upon the interest of debtor, as lessee, in Nebraska State School land lease No. 67,550. As security for $24,925 thereof, the court adjudged that appellees owned the second mortgage lien upon all of the owned ranch land of debtor in Brown and Blaine Counties, Nebraska.
 
 
 7
 Judge Delehant further found that, on March 5, 1951, Roe R. and Avis C. Black, the then owners of the ranch land, borrowed $70,000 from Union National Life Insurance Company, and, on the same date, executed their note for the amount of the loan, payable in annual installments, the final installment being due on January 1, 1973. The note bore interest at the rate of four per cent per annum, payable semi-annually. It further provided that all payments not made when due would bear interest from the due date at seven per cent per annum. The note also contained an acceleration clause which provided that, upon default in payment of any installment, the legal holder of the note could declare the whole debt immediately due and payable.
 
 
 8
 On the date of the note, as security for it, Roe R. and Avis C. Black executed a first mortgage on all of the ranch land. The mortgage was recorded in Blaine and Brown Counties, Nebraska, on March 27 and 28, 1951, respectively.
 
 
 9
 On August 14, 1952, default having occurred in the payment of an installment, debtor and Union National executed an extension agreement which provided that the unpaid principal of $70,000 would be payable in annual installments, commencing on January 1, 1953, and ending on January 1, 1975, with interest at the rate of four per cent payable semiannually. The extension agreement expressly provided that it did not, in any manner, change the provisions of the note and mortgage, except as expressly set out and that all other provisions in the note and mortgage remained in full force and effect.
 
 
 10
 As additional security, debtor, then the owner of a leasehold interest in certain real estate in Brown County, Nebraska, executed and delivered to Union National a conditional assignment of school land lease No. 67,550. The assignment was duly recorded on November 3, 1952, and constituted a first lien on the leasehold interest.
 
 
 11
 On about April 6, 1951, Roe R. and Avis C. Black executed their promissory note to Dean Sack in the principal sum of $100,000, payable one year after date, with interest at the rate of six per cent per annum from date, and at the rate of nine per cent per annum from the maturity of the note until paid. On the same date, as security, the Blacks gave their real estate mortgage upon the ranch land, subject to the prior mortgage held by Union National. The mortgage to Sack was filed for record on May 3 and May 17, 1951, in Brown and Blaine Counties, Nebraska, respectively. On September 11, 1952, an extension agreement was entered into between debtor and Sacks, which provided for the payment of the unpaid balance of the indebtedness in installments and also contained an acceleration clause.
 
 
 12
 On February 9, 1954, pursuant to the provisions of 1943 Rev.Stat.Neb. §§ 25-2137 to 25-2155, Union National instituted a proceeding in the District Court of Brown County, Nebraska, against Roe R. Black, Avis C. Black, Black Ranches, Inc., Dean Sack, Marlon Brando, Jr., John Doe [Clarence O. Howell], and Mary Doe [Ada P. Howell] for the foreclosure of its mortgages. Marlon Brando was permitted to intervene. All of the defendants, except John Doe and Mary Doe, were represented by counsel and appeared in the foreclosure action. Sack filed a cross-bill seeking foreclosure of his mortgage. The various filings and all proceedings in the action are fully detailed in Judge Delehant's opinion, and need not be recited here. On August 5, 1954, a decree was entered by the District Court of Brown County, Nebraska, finding that: (1) Union National was the owner of the note, mortgage and extension agreement, and, thereby, was the owner of the first lien upon all of the owned ranch land and upon the school land lease No. 67,550; (2) Dean Sack was the owner of the note, mortgage and extension agreement above referred to, and, thereby, was the owner of the second lien upon all of the ranch lands; (3) default had occurred in the payment of the debts evidenced by the Union National and Sack notes and extension agreements; (4) Union National and Sack had declared such debts to be wholly due and payable; (5) there was due Union National $69,913.72, with interest from August 5, 1954, at seven per cent per annum, and due Sack $24,925, with interest from August 5, 1954, at eight per cent per annum; and (6) Union National and Sack were entitled to foreclosure of their liens. Foreclosure was adjudged.
 
 
 13
 There were post-decretal pleadings in the foreclosure action which delayed effectuation of the foreclosure decree and sale of property thereunder. When the reorganization petition was filed on October 22, 1954, the post-decretal filings had not been fully disposed of. By virtue of § 148 of the Bankruptcy Act (11 U.S.C.A. § 548),[6] the state court's decree of foreclosure has, therefore, been stayed.
 
 
 14
 On December 30, 1955, in consideration of the payment to Union National "of its first lien of $69,913.72 plus interest and costs", it sold, transferred and assigned to appellees all of its "right, title and interest" in the foreclosure decree and authorized the assignees to collect and enforce payment of the lien.
 
 
 15
 On January 3, 1956, Dean Sack sold, transferred and assigned to appellees his right, title and interest in the decree of foreclosure, the note, and the second mortgage. On the basis of those assignments appellees filed this claim.
 
 
 16
 Appellants advance several arguments to support their basic contention that the court erred in allowing claim No. 5 as a valid secured claim upon debtor's real estate.[7] It is asserted that the liens of the mortgages were merged in the decree of foreclosure; that "Claim No. 5 rests solely upon whatever may be the judicial effect of the foreclosure decree itself, and that no claim is made by [appellees] to a lien based upon any note, mortgage, extension agreement or other contract, apart from such decree." Appellants couple with that assertion the fact that Judge Delehant found that debtor was continuously insolvent between April, 1952, and the inception of these proceedings on October 22, 1954. Therefore, appellants invoke § 67(a) (1) of the Bankruptcy Act (11 U.S.C.A. § 107 (a) (1)), which provides, in pertinent part, that every lien "obtained by attachment, judgment, levy, or other legal or equitable process or proceedings within four months before the filing of a petition initiating a proceeding under this title by or against such person shall be deemed null and void (a) if at the time when such lien was obtained such person was insolvent or (b) if such lien was sought and permitted in fraud of the provisions of this title".
 
 
 17
 As we understand appellants' brief, their theory is that: the entry of the foreclosure decree effectively wiped out the two mortgage liens; the decree created another lien upon debtor's land; and, since this lien came into existence within four months of the filing of the petition for reorganization, it is barred by § 67(a) (1), supra.
 
 
 18
 The contention finds no support in the statute, precedent, or common logic. It is beyond dispute that: (a) the recording of the Union National and Sack mortgages created valid first and second liens upon the ranch land; and (b) the liens attached more than four months prior to the filing of the reorganization petition. A judicial foreclosure proceeding in Nebraska is not designed to remove the original mortgage lien and create a new and independent one.[8] Rather, the proceeding is required to effectuate a foreclosure and sale of the mortgaged property. Thus, in harmony with Judge Delehant's view, we conclude that the foreclosure decree under consideration did not destroy the liens of the two mortgages but merely judicially recognized them as a legal basis for the ultimate sale of the mortgaged land. It follows that the assignments in question carried with them, and transferred to appellees, the mortgage liens, unaffected by the provisions of § 67(a) (1). The early case of Metcalf v. Barker, 187 U.S. 165, 23 S.Ct. 67, 47 L.Ed. 122 (1902), is apposite to the question at hand. There, the court, in considering the predecessor to § 67(a) (1), decided that the statute invalidated the "lien created by a levy, or a judgment, or an attachment, or otherwise", and that a "judgment or decree in enforcement of an otherwise valid pre-existing lien is not the judgment denounced by the statute * * *." Id., 174, 23 S.Ct. 71. Accord: Yumet & Co. v. Delgado, 243 F. 519 (1 Cir. 1917), where an attachment lien obtained more than four months prior to bankruptcy was sustained, even though the subsequent judgment enforcing the lien was rendered within four months of bankruptcy; Gatell v. Millian, 2 F.2d 365 (1 Cir. 1924); Morris W. Haft & Bros. v. Wells, 93 F.2d 991 (10 Cir. 1937); In re Van Meter, 135 F.Supp. 781, 784 (W.D.Ark.1955); 4 Collier on Bankruptcy, ¶ 67.04, p. 73, where the author, discussing § 67(a) (1), states:
 
 
 19
 "The crucial date at the other end of the period is that when the lien attaches, regardless of when the proceeding to enforce it is commenced, or when the judgment making it enforceable is entered."
 
 
 20
 Appellants also contend that there is no evidence in this record to show that debtor was ever indebted to Union National or Sack or that any such indebtedness was secured by mortgages on debtor's property. This assignment is utterly without substance.
 
 
 21
 The record, in context, demonstrates that the indebtedness was incurred in the amount evidenced by the notes, and that the first and second mortgages were executed contemporaneously with the notes and created liens upon debtor's land. In fact, since all of this was tacitly conceded in the foreclosure proceeding, in the petition for reorganization, in the objections to claim No. 5, and in the trial of that claim,[9] we have difficulty in comprehending this late attack upon the validity of the indebtedness and the liens created by the mortgages.
 
 
 22
 Appellants also assert that the foreclosure decree was fraudulently obtained by Brando and Cobbey and that Union National, Sack and Strand (one of the appellees) "participated in Brando's fraudulent project." The contention is rejected.
 
 
 23
 Although appellants' brief is replete with charges of fraudulent conduct on the part of appellees, the record is devoid of evidence, direct or circumstantial, to furnish support for the accusations. It appears that the objectors to claim No. 5 (appellants herein and others who have not appealed) did not, in their objections, as amended, directly, or by intimation, raise the issue of fraud on the part of appellees now so vociferously urged upon us. Neither does the record indicate that this issue was actually litigated. Although the court did not make an express finding that the foreclosure decree was not infected by any fraud, instigated or participated in by appellees, such determination is implicit in the court's findings and conclusions, and is supported by substantial evidence.
 
 
 24
 Appellants question the accuracy of the amount of interest allowed. They contend that the court erroneously: (a) compounded interest; (b) increased the interest rate of Union National's and Sack's notes from four per cent and six per cent, to seven and eight per cent, respectively; (c) allowed penalty interest; and (d) allowed interest on the claim after the Chapter X proceeding had been commenced.
 
 
 25
 The question of the allowance of interest on claims against debtors' estates was discussed in Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), where the Supreme Court noted that: "When and under what circumstances federal courts will allow interest on claims against debtors' estates being administered by them has long been decided by federal law. * * * The general rule in bankruptcy and in equity receivership has been that interest on the debtors' obligations ceases to accrue at the beginning of the proceedings." Id., 163, 67 S.Ct. 240. The court further observed, however, that "[s]imple interest on secured claims accruing after the petition was filed was denied unless the security was worth more than the sum of principal and interest due." (Emphasis supplied). (Citing Sexton v. Dreyfus, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244 (1911). Id., 164, 67 S.Ct. 240.[10] See also, In re Magnus Harmonica Corp., 262 F.2d 515 (3 Cir. 1958), where the court recognized that interest is ordinarily not recoverable after the date of institution of a Chapter X proceeding, but the rule need not apply when the creditor is secured above the amount of his principal debt; Weeks v. McInnis, 200 F.2d 611, 613 (6 Cir. 1953), cert. denied, 345 U.S. 958, 73 S.Ct. 940, 97 L.Ed. 1378. And see, Smith v. Robinson, 343 F.2d 793, 800 (4 Cir. 1965), for a discussion of general principles regarding the allowance of interest.
 
 
 26
 Although the Union National note did not provide for compound interest, the state court, in decreeing the foreclosure, improperly allowed interest from January 1, 1954, to August 5, 1954, on $1,300, the amount of interest due on the unpaid principal on January 1, 1954, and determined that the amount due on this note, including the interest on interest, as of August 5, 1954, was $69,913.72. In his disposition of claim No. 5, Judge Delehant accepted the state court's determination, and allowed interest, at the stipulated rate of seven per cent, from August 5, 1954, on $69,913.72. It was error for the state court to compute the interest on the $1,300 in arriving at the total amount due, and Judge Delehant's allowance perpetuated that error. Therefore, the order should be, and is, modified by reducing the amount due, from $69,913.72 with interest, from August 5, 1954, at the rate of seven per cent, to $69,858.87 with interest, from August 5, 1954, at the rate of seven per cent. (The interest on $1,300 from January 1, 1954, to August 5, 1954, at the rate of seven per cent, amounts to $54.85).
 
 
 27
 In allowing post-petition interest, the district court did not limit the recovery thereof to the income from the securities or to the proceeds from the sale of the securities. Accordingly, the order of allowance is also modified to provide for the allowance of interest, at the specified rates, from October 22, 1954, until the consummation of a plan of reorganization, on condition, however, that recovery be limited to the income from the securities or from the proceeds of any sale thereof.
 
 
 28
 Appellants repeatedly characterize the increased rate of interest from maturity, for which the notes provided and which the court allowed, as a "penalty". Manifestly, appellants are attempting to bring this case within the rule that "A bankruptcy court is essentially a court of equity and will therefore not enforce a penalty." In re Tastyeast, Inc., 126 F.2d 879, 881 (3 Cir. 1942), cert. denied, Modern Factors Co. v. Tastyeast, Inc., 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766. This case recognizes that: "[t]he question whether a contract to increase interest after default is an agreement to exact a penalty is one of state law and state policy." Id., 881-882. In the early cases of Havemeyer v. Paul, 45 Neb. 373, 63 N.W. 932, 937-938 (1895) and Omaha Loan & Trust Co. v. Hanson, 46 Neb. 870, 65 N.W. 1058 (1896), the Supreme Court of Nebraska decided that a higher lawful rate of interest from maturity provided for in a note or contract did not constitute a penalty. That holding has been followed. Western Securities Co. v. Naughton, 124 Neb. 702, 248 N.W. 56 (1933); Moffitt-Harrison Builders, Inc. v. Sandman, 177 Neb. 425, 129 N.W.2d 524 (1964).
 
 
 29
 We recognize, of course, that there may be situations where the higher rate would produce an inequitable or unconscionable result, so as to require disallowance thereof. But we are not constrained on this record to upset Judge Delehant's conclusion that the increased stipulated rates are not entitled to recognition.
 
 
 30
 Appellants have presented other contentions directed to the amount in which claim No. 5 was allowed; the claimed right of debtor to reinstate that part of the loan which, assertedly, is not due until the year 1975; that appellees did not pay full value for the assignment of the Sack note, extension agreement and mortgage; and, finally, the asserted failure of the evidence to establish that there was a valid assignment of the Union National indebtedness to appellees. We have accorded each allegation of error careful consideration. As observed initially, Judge Delehant exhaustively examined all facets of the claim and considered every objection thereto. On this appeal, appellants have raised objections which were not presented to the trial court. They have, nonetheless, been considered and found to be insufficient to justify us in interfering with the allowance of the claim, except in the two respects above mentioned.
 
 
 31
 OFFSETS AND COUNTERCLAIMS TO CLAIM NO. 5.
 
 
 32
 Appellants assert two "offsets and counterclaims" against the allowance of claim No. 5. They contend that, even if claim No. 5 is allowable, they are entitled to offset and counterclaim for "the fair and reasonable rental value of debtor's land or the net income" actually derived therefrom by Strand, while in possession between May 1, 1956, and April 30, 1960, whichever was higher, because (1) Strand was a mortgagee at the time he was in possession of debtor's land, or (2) "Strand voluntarily bought his supposed interests in the void foreclosure decree while debtor was not only insolvent, but in bankruptcy reorganization, and because Strand did not acquire possession of debtor's land in an open, fair and proper manner." Appellants also contend that they are entitled to an offset and counterclaim "for the sum of $7,380 as the fair and reasonable grazing fee due debtor from Strand for grazing his 615 cattle on debtor's land between mid-September and mid-December, 1955."
 
 
 33
 On March 8, 1956, Mr. Rowan, the first court-appointed "limited" trustee for the debtor, executed a "feeding privilege" agreement with Strand, effective until May 1, 1956. Thereafter, June 7, 1956, the court approved a written lease of debtor's land to Strand. The leasehold period was retroactive in part, running from May 1, 1956, to May 1, 1957, at a rental of $8,320. Pursuant to a petition of Trustee Berkheimer, Judge Delehant entered an order April 26, 1957, approving a second lease of debtor's land to appellees from May 1, 1957, to April 30, 1958, at a rental of $9,152. A third lease of debtor's land to appellees from May 1, 1958, to April 30, 1959, at a rental of $10,400 was subsequently approved by the court, after a hearing. March 26, 1959, a fourth lease was submitted to the court. However, the court entered an order for competitive bidding on the lease, which was to run from May 1, 1959, to April 30, 1960. Roe R. Black and appellees both offered $10,500, and Judge Delehant approved the fourth lease to appellees at that rental. At a hearing on January 13, 1960, appellees bid $17,500 for the privilege of another lease, but were outbid by Mr. Garwood, whose lease at a rental of $18,000 from May 1, 1960, to April 30, 1961, was approved by the court. Following three additional leases for $16,370, $18,850 and $18,850 per year, respectively, the trustee was authorized to lease the land, from May 1, 1964, to April 30, 1965, for a rental of $20,000.
 
 
 34
 Appellants contend that appellees' total payment over the four years, from May 1, 1956, to April 30, 1960, amounting to $38,372, was far below the fair rental value of the land for those four years. Appellants rely primarily upon two computations to arithmetically support their claim. First, they assert that the $20,000 lease obtained in 1964 is reflective of the fair rental value of the land, and multiply that $20,000 by four years, obtaining a claimed fair value of $80,000 for the four-year period during which appellees occupied the premises. The difference between $80,000 and the $38,372 actually paid by appellees is claimed to be owing.
 
 
 35
 Alternatively, they claim that the reasonable rental value should be determined by accepting a grazing fee of $4 per head per month for each of the 1,000 cattle appellees kept on the ranch during the four years. The $4 per head per month figure is the amount charged to several cattle owners for grazing privileges in years prior to the filing of the petition for reorganization. If this were the reasonable rental value, it would mathematically total $192,000 and appellees, according to appellants' theory, would be accountable for the difference between $192,000 and $38,372.
 
 
 36
 Judge Delehant concluded, and the evidence amply supports his finding, that the land had been over-grazed and worn out during the years preceding the reorganization proceeding and was not in perfect condition when first put under the trustee's control. Therefore, the figure of $4 per head per month obtained prior to bankruptcy is not indicative of the reasonable rental value at the time the leases were made by the trustee. Likewise, the rental value of the land in 1964 does not necessarily establish its worth in 1956, eight years earlier. No evidence appearing to the contrary, it must be presumed that the court approved agreements between Strand and the trustee provided for the fair and reasonable rental for each of the years in question. Appellants' unsupported intimation to the contrary does not merit further consideration.
 
 
 37
 Having alleged that Strand leased debtor's land for less than its reasonable value, as discussed, supra, appellants go on to claim that Strand, as a mortgagee in possession, had a duty to account for the higher of net income received or fair rental value. For the proposition that a mortgagee in possession has a duty to account, appellants cite a number of Nebraska cases. See, Hays v. Christiansen, 114 Neb. 764, 209 N.W. 609 (1926); Hatch v. Falconer, 67 Neb. 249, 93 N.W. 172 (1903); Kemp v. Small, 32 Neb. 318, 49 N.W. 169 (1891); Felino v. K. S. Newcomb Lumber Co., 64 Neb. 335, 89 N.W. 755 (1902). However, appellants overlook the fact that the leases complained of were executed pursuant to § 189 of the Bankruptcy Act, 11 U.S.C.A. § 589, which provides:
 
 
 38
 "A trustee or debtor in possession, upon authorization by the judge, shall operate the business and manage the property of the debtor during such period, limited or indefinite, as the judge may from time to time fix, and during such operation or management shall file reports thereof with the court at such intervals as the court may designate."
 
 
 39
 Judge Delehant properly concluded that appellees owed no duty to account, as they did not occupy the debtor's land in the posture of mortgagees in possession. On the contrary, he correctly found that "[i]n their use of the land, they were simple cash rent tenants under successive leases, executed by the trustees, and principally by the disinterested trustee, in pursuance of the orders, and with the express approval, of this court."
 
 
 40
 Appellants further assert that Strand had a duty to account, first, because he took possession while the debtor was insolvent and in bankruptcy reorganization and, second, because he did not acquire possession in an "open and fair" manner. The fact that Strand took possession by virtue of a lease from the trustee of a bankrupt in reorganization certainly does not obligate Strand under any bankruptcy provision, or other law, to account for anything more than the fair rental value under the lease. Nor do appellants cite any authority for their proposition. Appellants' second contention is patently untrue and there is not a shred of evidence in the record to support it.
 
 
 41
 Finally, appellants contend that the record discloses that Strand bought 615 head of Penny Poke cattle from the Brandos in September, 1955, did not remove them from the debtor's property until mid-December, 1955, and did not pay any grazing fee for the three months during which the cattle remained on the property. Appellants assert that, at a rate of $4 per head per month, $7,380, a reasonable value for the grazing rights, should be set off against claim No. 5.
 
 
 42
 Appellants have misinterpreted the evidence. There was conflicting testimony as to when the sale took place. However, the bulk of references to the sale by Brando, Howell and Strand suggest that it occurred in mid-September, 1955, either the 15th or the 19th. Therefore, Judge Delehant's finding that the sale was made "under date of October 16, 1955, but possibly as early as September 19, 1955" was certainly supported by the evidence.
 
 
 43
 Summarized, the only evidence concerning the removal of the cattle was that they were mostly sold within two or three weeks, but that the last 50 to 100 head were removed by the end of November or the beginning of December. There is no evidence in the record that more than 100 cattle were on the ranch for the entire three months and, in fact, a fair inference from the testimony would be that considerably fewer than 100 remained by the end of November.
 
 
 44
 In view of these facts, as disclosed by the record and recognized by Judge Delehant, we cannot conclude that the court was erroneous in its finding that the cattle were removed from the debtor's ranch within a reasonable time after the sale and that no grazing fees were owing.
 
 
 45
 In summary, it is evident from a consideration of all the objections to the allowance of claim No. 5 and of the asserted offsets and counterclaims that the bulk of the issues raised by appellants presented fact questions. It is, of course, well established that our review of such questions is limited to a determination of whether the trial court's factual findings were clearly erroneous. F.R.Civ.P. 52 (a); Smith v. Robinson, 343 F.2d 793, 795 (4 Cir. 1965); Reserve Rural H. S. Dist. No. 4, Brown County v. Hanika, 339 F.2d 788, 791 (8 Cir. 1964); Norris Dispensers, Inc. v. United States, 325 F.2d 140, 141 (8 Cir. 1963).
 
 
 46
 Having carefully perused the entire record, with the exception of the two interest rate modifications discussed, supra, we have not only been unable to discover clear error in Judge Delehant's findings of fact, but have concluded that they are completely substantiated by the evidence. We are also satisfied that the ultimate judgment was not induced by a misconception of the applicable law.
 
 
 47
 As modified, the order and judgment is affirmed.
 
 
 
 Notes:
 
 
 [1]
 Apparently, there has not yet been any formal plan for reorganization submitted to, or approved by, the court. We speculate that this delay has been due to the necessity of first finally determining the number and amount of valid claims against the corporation
 
 
 [2]
 The pertinent parts of the original files, consisting of 10 volumes of pleadings, orders and memorandum opinions, have also been examined
 
 
 [3]
 The corporation was organized under the name of Palmer Ranches, Inc., in August, 1949. However, by an amendment to the Articles of Incorporation in September, 1949, the name was changed to Black Ranches, Inc
 
 
 [4]
 The petitioners were Rogers Grain and Feed Company, Hagel Lumber and Coal Company, Masters Lubritorium, Dwight Moody, and James M. Kennedy. One of the attorneys who represented the petitioners in the filing of the petition was Thomas H. Fisher, of 135 South La Salle Street, Chicago 3, Illinois. None of the petitioning creditors appears as a party to any of these four appeals. However, Thomas Hart Fisher is either an appellant or an appellee in each of the appeals. Thomas Hart Fisher filed a brief, as attorney for Black Ranches, Inc. and for himself, in cases Nos. 17,990 and 17,991 and appears "of counsel" in the brief of case No. 17,993. He was also the counsel who presented oral argument, for Black Ranches and himself, in all four appeals
 
 
 [5]
 The record shows that 31 claims have been disallowed and 3 claims remain undetermined
 
 
 [6]
 This section provides that an order approving a Chapter X proceeding "shall operate as a stay of a prior pending bankruptcy, mortgage foreclosure, or equity receivership proceeding, and of any act or other proceeding to enforce a lien against the debtor's property."
 
 
 [7]
 As heretofore noted, of the unsecured creditors (approximately 18 in number) whose claims have been allowed (some for substantial amounts), only the parties designated as appellants in the caption of this case are complaining about the allowance of claim No. 5
 
 
 [8]
 The statutory authority for judicial foreclosure of mortgages is found in § 25-2137 et seq., 1943 Rev.Stat.Neb., Reissue of 1964
 
 
 [9]
 The five petitioning creditors, represented, as above noted, by Thomas H. Fisher, alleged, in part, that the liabilities of the debtor consist of "[u]npaid first and second mortgages in the sums of approximately $70,000 and $25,000, respectively. * * * The cash on hand is insufficient to meet current liabilities and maturing interest and principal obligations on its first and second mortgages." It was further alleged that the foreclosure proceeding was pending in Brown County, Nebraska; that a "so-called" decree of foreclosure had been entered on August 5, 1954; that the foreclosure proceeding will continue to pend in said court until the sale of the mortgaged premises approximately nine months following the entry of decree of said foreclosure and in the month of May, 1955, subject to the proceedings in this court in this cause. * * * "By reason of the existing defaults, the holders of said first and second mortgages have exercised their rights to accelerate the maturity thereof, and the principal of said first and second mortgages is now due and payable."
 Other allegations pertaining to the first and second mortgages appear in the petition, but need not be restated here.
 
 
 [10]
 InVanston, the Supreme Court disapproved the allowance of interest upon interest.