In the Matter of Raymond Chester MILLER, Bankrupt.

Merrill T. LANDWEHR, Appellant,

v.

UNITED STATES of America, Appellee.

No. 72–3469.

United States Court of Appeals, Fifth Circuit.

Sept. 17, 1973.

---

Merrill T. Landwehr, New Orleans, La., for appellant.

George H. Becker, Asst. Regional Counsel, I.R.S., New Orleans, La., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Murray S. Horwitz, Attys., Tax Division, U.S. Dept. of Justice, Washington, D.C., Gerald J. Gallinghouse, U.S. Atty., New Orleans, La., for appellee.

Before GOLDBERG, CLARK and RONEY, Circuit Judges.

RONEY, Circuit Judge:

■ The Trustee in Bankruptcy for Raymond C. Miller appeals from a decree of the District Court ordering the Referee to allow the filing of a tax claim by the United States against the Bankrupt estate. The Referee had denied the claim as being untimely filed. The case involves the effect of a Referee's second notice of the first meeting of creditors which apparently inadvertently set a deadline for filing claims different from that established by the first notice. We affirm the decision of the District Court that the Government's claim filed prior to the second date should be allowed, but on a different ground than that asserted by the District Court. We hold that the Referee had the power to extend the time for filing a Government claim, and that, having received a notice in the apparent exercise of that power, the Government was entitled to rely thereon.

The petition for bankruptcy was originally filed on January 31, 1968, in the United States District Court for the Southern District of Florida. On March 19 of that year the Referee in Bankruptcy mailed a notice to all creditors, including the Internal Revenue Service, informing them that the first meeting of creditors would be held April 5, 1968, and that the last day for filing proofs of claim against the Bankrupt estate would be October 4, 1968. At the meeting of

creditors on the designated date the Referee determined that the proceeding should be transferred to the United States District Court for the Eastern District of Louisiana for the convenience of all parties in interest, pursuant to Section 32 of the Bankruptcy Act, 11 U.S.C.A. § 55. On May 6, 1968, the proceedings were transferred. Subsequently, on July 18, 1968, the Louisiana Referee in Bankruptcy mailed notices to all creditors, including the IRS, which stated that a "first meeting of creditors" was to be held on August 6, 1968, and that the final date for filing proofs of claim against the bankrupt estate would be February 6, 1969. On January 27, 1969, prior to this Louisiana "last day" for filing proofs of claim but after the bar date set by the Florida Referee, the IRS filed the contested proof of claim in this proceeding.

The Referee dismissed this claim as untimely, holding that the original bar date of October 4, 1968, was controlling and that the later bar date inadvertently established by his court's notice was ineffective. In reversing the Referee's determination, the District Judge held that the Florida court's notice was rendered nugatory by the transfer of the matter to Louisiana, and that the later bar date established by the Louisiana court order was controlling. The IRS was allowed to file its claim.

We first examine the continuing effect, if any, of the notice issued by the Florida court prior to the transfer of the case to Louisiana. There is a paucity of relevant authority interpreting the change of venue statute under the Bankruptcy Act. The analogy provided by decisions applying the general change of venue provision, 28 U.S.C.A. § 1404(a), is helpful. In Magnetic Engineering & Manufacturing Co. v. Dings Manufacturing Co., 178 F.2d 866 (2d Cir. 1950),

the court reaffirmed the proposition that when an action is transferred through a change of venue, it remains what it was: "all further proceedings in it are merely referred to another tribunal, leaving untouched whatever has been already done." *Id.* at 868.

■ The District Court in Florida relinquished jurisdiction over the case when it transferred the matter to the Louisiana District Court. But the orders issued prior to the transfer continued as though the case were still pending in the original district.[1] The transfer for the convenience of the parties simply brought the cause as it was to the transferee jurisdiction.

Since the October 4 bar date was still in effect at the time of the transfer, the question becomes whether the Louisiana District Court could, through its exclusive jurisdiction, alter that date by a subsequent order. Section 57n of Bankruptcy Act, 11 U.S.C.A. § 93(n) provides:

> Claims which are not filed within six months after the first date set for the first meeting of creditors shall not be allowed: *Provided, however,* That the court may, upon application before the expiration of such period and for cause shown, grant a reasonable fixed extension of time for the filing of claims by the United States . . .

Thus, the Court can alter the original bar date by a subsequent order at least insofar as it affects the Government. Although the IRS did not apply to the Court for an extension of time, the fact remains that the Court had the power to issue an order extending the time for filing claims in respect to the Government.

When the IRS Agent learned of the "new bar date" he believed the order was an extension granted by the Court.[2]

---

1. *See* Ginsburg v. Mutual Life Ins. Co. of N.Y., 170 F.Supp. 212 (S.D.N.Y.1958). *See also* C. Wright, Federal Courts § 44, at 166 (2d ed., 1970).

2. The record of Agent Brown's testimony before Referee Flanagan reveals the following:
   By Mr. Schaffer:
   Q Did you take any action to confirm this date [Feb. 6]?

After a discussion with his supervisor, it was agreed he should rely on this new date and conduct his examination accordingly.[3] It was because of this reliance that the tax claim was not submitted until January 27, 1969.[4] The Government did not request an extension since under the new date there was sufficient time to gather the necessary information to file a claim.

It is now admitted by the parties and the Referee that the order extending the bar date was an inadvertent mistake.

> A  Yes, I did.  I went to the records here in the building.
> Q  The offices of the Referee?
> A  Correct.
> Q  And what did you find there?
> A  I found the notice issued by, I believe, Judge Flanagan himself, *extending* the bar date to February.
>
> 3.  Q  Did you talk this over with any of your peers or superiors?
> A  Well, when I received the notice on the extension of the bar date to February the 6th of 1969, I discussed this with my group supervisor and tried to attempt (sic) whether or not this was a valid extension—should I rely—not whether it was a valid extension, but should I rely on this extension in my examination; and discussing it with him, he and I came to the agreement that I should rely on this.
>
> 4.  The record demonstrates that Agent Brown was acting post haste to meet the October 4th deadline but relaxed his efforts when he learned of the Court order:
> By Mr. Schaffer:
> Q  When you received the file pertaining to Raymond C. Miller, may we ask what was your first effort on behalf of the Service as regards that file?
> A  When I received the file, I immediately tried to contact the taxpayer, . . .
>
> *    *    *    *    *
>
> Q  What were you trying to do at this time with regards to the file on Raymond C. Miller?  What was your primary objective?
> A  My primary objective was contacting the taxpayer to let him know that his income tax liability for the year '66 was in question and to get him to submit all the necessary records I needed to verify that tax liability.
>
> *    *    *    *    *
>
> Q  May I ask, for the record, at what point in time, if you recall, was it that you asked for this collateral investigation [by

Neither the Referee nor the Trustee detected the difference in dates until after the Government had filed its claim. Should the Government be penalized for the Court's error?  The Trustee argues that it should because the IRS was dilatory in its investigation, was put on notice as to the apparent conflict in the dates, and has not attempted to collect its non-dischargeable tax claims by pursuing the Bankrupt during the five year period this bankruptcy has been pending.

> the New York IRS office into records of the Bankrupt kept in that region]?
> A  It was in September.
> Q  What part of September?
> A  September—the first week of September—September the 4th, I believe.  Now, I asked for this "collateral" and then I had to follow up on it.
> Q  It seems to me, Mr. Brown, that you were doing a good bit of work in trying to locate records and what-not to crystallize any liability of the taxpayer for the first couple of weeks that you had the files.  Was there any reason for this—this speed that you showed?
> A  Yes, because the bar date was October the 4th of '68.
>
> *    *    *    *    *
>
> Q  Is it your testimony then that even up to the first week of September you were aware of an October 4th deadline for filing claims?
> A  Correct.
>
> *    *    *    *    *
>
> Q  Can you tell us when approximately this knowledge came to you of the new bar date?
> A  I would say sometime in September—early September.  When exactly, I couldn't give you.
> Q  When you first learned of this postponement formally from the records in the Bankruptcy Court offices, what was your reaction on your handling of the Raymond C. Miller case?
> A  Well, at that time, I felt I can relax the speed at which I was trying to close the case out somewhat to secure as much information as I possibly could.
>
> *    *    *    *    *
>
> Q  Did you have any contact with the Bankruptcy Court after you found out the bar date was set back to February?
> A  No, I relied on this February 6th date.
> . . .  [I]t led me to believe that there was additional time in which I can attempt to secure additional information which I didn't have at the present time.

78

The record set out in the margin above demonstrates that Agent Brown pursued the investigation with necessary speed once his office was apprised of the action. The fact that the Government was put on notice of the two dates becomes inconsequential when it is realized that the Court had the authority to extend the date and the IRS relied on the apparent exercise of this authority.

Additionally, the Trustee was put on equal notice with the Government. Since he stands in a fiduciary relationship to all the creditors and has the inherent duty to keep them informed, the Trustee should have noted and clarified the discrepancy presented by the second court order. The Trustee concedes that the Government could have probably obtained an extension of time under Section 57n had it seen the necessity for it and requested an extension. The Government's evidence indicates it could have met the October 4 deadline, if it knew it was required to do so.

The contention that the IRS has not independently attempted to collect the tax claim is of no help to the Trustee. The Government had a right to present its tax claim with the other creditors in the bankruptcy proceeding. It presented that claim relying upon a court notice which was ostensibly within the Court's authority to make.

The general equity power existing in the bankruptcy courts is well established and has been traditionally recognized. Bank of Marin v. England, 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966). Cautiously, this equity power has been employed to prevent an unfair result occasioned by the six-month period provision of Section 57n. In re Miracle Mart, Inc., 396 F.2d 62, 64 (2d Cir. 1968); In re Martin Edsel, Inc., 228 F. Supp. 538, 540–541 (D.C.N.H.1968). See Pepper v. Litton, 308 U.S. 295, 305 n. 11, 60 S.Ct. 238, 84 L.Ed. 281 (1939). An unfair result would obtain in the case at bar if the Government were not allowed to file its claim after reliance on the court order apparently extending the

filing date. The District Court was correct in allowing the Government to file its claim.

The District Court found that the Government's proof of claim was "amply sufficient prima facie evidence of a valid indebtedness and must be the basis of allowance of such claim." The Government's proof of claim was filed on IRS Form 2317, the usual form submitted by the United States for internal revenue taxes in bankruptcy matters. The sufficiency of filing through use of IRS Form 2317 has been upheld. In re Tyner, 301 F.Supp. 1234 (M.D.Ga.1969).

Affirmed.