**In the Matter of MACON UPLANDS VENTURE, A Limited Partnership, Debtor.**

**Civ. A. No. 79–200–MAC.**

United States District Court,
M. D. Georgia,
Macon Division.

Oct. 10, 1980.

See also D.C, 2 B.R. 429, 5th Cir., 624 F.2d 26.

Charles M. Tatelbaum, Stephen F. Fruin, Schimmel & Tatelbaum, P. A., Baltimore, Md., Albert P. Reichert, Anderson, Walker & Reichert, William G. Boyd, Macon, Ga., for Macon Uplands Venture.

William M. Flatau, Brown, Katz, Flatau & Hasty, Macon, Ga., for Greater Macon Developments, Inc.

Carol V. Clark, Lowell Hughen, Hansell, Post, Brandon & Dorsey, Atlanta, Ga., Cubbedge Snow, Jr., Martin, Snow, Grant & Napier, Macon, Ga., for Metropolitan Life Ins. Co.

Timothy Adams, Jones, Cork, Miller & Benton, Macon, Ga., for First Nat. Bank & Trust Co.

OWENS, Chief Judge:

The Macon Hilton Hotel is a sixteen story, 302 guest room facility, located in downtown Macon, Georgia. From its opening in December 1970, until its sale to New Uplands, Inc. in September 1972, the hotel operated unsuccessfully under the management by contract of Hilton Hotels Corporation. When New Uplands, Inc. purchased the property in September 1972, the owner conveyed title subject to an outstanding 7¾ %, monthly payment, $3,300,000 final payment due May 1, 1986, first security deed loan to Metropolitan Life Insurance Company and an outstanding some $2,500,000 second security deed loan to the First National Bank and Trust Company in Macon. As sole additional consideration the owner received a $750,000 promissory note secured by a third security deed. New Uplands, Inc. subsequently transferred title subject to these secured debts to Uplands, Inc. and Uplands, Inc. likewise transferred title to Macon Uplands Venture, a limited partnership. Hilton's management contract was terminated at the end of 1972; since then the hotel has been operated under a Hilton franchise by Metropolitan Hotels, Inc., a corporation owned by the principals of these various owning entities.

While the Macon Hilton Hotel because of its downtown location cannot even be seen by persons travelling on I–75, it is visible from I–16; however, it is not located or close to an I–16 interchange and is thus not easily accessible to prospective interstate highway travellers. It is a convention type hotel that to succeed must charge higher room rates than its competition charges. Since its competing motels–Sheraton, Holiday Inn, Howard Johnson's, Ramada, and Quality Inn–not only charge much less for rooms but are also visible and easily accessible to I–75 or I–475 tourists, the Hilton gets fewer tourists or transient quests than it needs and consequently must have more than normal numbers of convention guests to survive. Hilton management during 1971 and 1972 achieved an occupancy rate of only 32 to 33%. Metropolitan Hotels, Inc.'s management from 1973 through 1977 achieved a slightly higher occupancy rate— the best was 1977 in which paid occupancy was 44.3%–but because of its competitors' lower rates succeeded in raising its average room rates by only one dollar during that five year period. Assuming an adequate average room rate, Metropolitan Hotel officials estimate that a 52% occupancy rate is needed for the hotel to even break even.

With some $35,000.00 per month to be paid for debt service, taxes, and insurance on the hotel property and with a less than needed average room rate and occupancy, the new owners and managers were also unsuccessful; and by the end of 1977, their fifth year of operation, they had experienced a cash flow deficit of $335,633.00. See May 31, 1978 balance sheet.

Around the end of 1977 the owner ceased paying Metropolitan Life Insurance Company its first security deed monthly payment of $33,347.50 ($26,042.50 principal and interest, plus $7,305.00 tax and insurance es-

crow), and Metropolitan Life commenced non–judicial foreclosure proceedings. On February 17, 1978, Macon Uplands Venture filed an original petition in the United States District Court for the District of Maryland for an arrangement in bankruptcy under Chapter XII of the Bankruptcy Act, 11 U.S.C. § 801, *et seq.*

It's schedules showed unpaid debts totalling $7,826,331, to wit: wages and taxes of $30,397;[1] first security deed balance of $3,035,095, plus escrow advance $14,713; second security deed balance of $2,919,958, plus accrued interest of $108,861; unsecured trade creditors of $167,006.89; to affiliated companies $1,224,674; and operational expenses $375,316. The $750,000 third mortgage was omitted from the schedules; if included, unpaid debts would have totalled $8,576,331. Assets or property other than the hotel which was shown at a book value of $5,582,687 included cash of $2,680; deposits $9,482; office equipment and supplies $376,170; inventory $65,886; trade accounts receivable $96,108; bad checks $6,041; and affiliated company receivables $311,215. Assets other than the hotel–the real property–totalled some $867,-582, and of that amount $311,215 was due from affiliated companies.

The commencement of the Chapter XII proceeding caused an automatic stay of Metropolitan's foreclosure efforts. 11 U.S.C. § 828 and Bankruptcy Rule 12–43. Upon motion of Metropolitan Life a bankruptcy judge of the United States District Court for the District of Maryland on March 30, 1978, transferred the entire proceeding to this United States District Court. 11 U.S.C. § 55 and Bankruptcy Rule 116. It was received and filed in this court on April 11, 1978, and referred by the Clerk to the Bankruptcy Judge of this court. 11 U.S.C. §§ 45 and 831, and Bankruptcy Rule 102.

Bankruptcy Judge Patterson presided over the first meeting of creditors on June 19, 1978, some three days after the debtor in possession filed its first verified written report of the financial condition of the estate. *See* Feb. 17, 1978, Order of the bankruptcy judge authored by debtor's attorneys and requiring that report to have been filed within thirty (30) days of Feb. 17. The debtor asked for additional time to file its plan, was allowed until September 5 and on September 6 complied by filing. That plan as amended and modified on September 25, was first heard on November 6, 1978; and as further amended and modified on December 11, 1978, and February 15, 1979, was the subject of a February 26 through 28, 1979, hearing before the bankruptcy judge.

On July 13, 1979, the bankruptcy judge filed his findings of fact and conclusions of law rejecting and refusing confirmation of the debtor's plan. By order of the same date the bankruptcy judge dismissed debtor's petition for a Chapter XII Real Property Arrangement but retained jurisdiction to assess costs and allow compensation for services rendered. The bankruptcy judge's findings of fact and conclusions of law are attached as Appendix "A".

Pursuant to 11 U.S.C. § 11(a)(10) which empowers United States District Courts as courts of bankruptcy to "consider records, findings, and orders certified to the judges by referees [now called bankruptcy judges], and confirm, modify, or reverse such findings and orders, or return such records with instructions for further proceedings;" and pursuant to Bankruptcy Rules 801, 802 and 12–61, the debtor on July 23, 1979, filed an appeal to this district court from the bankruptcy judge's July 13, 1979, findings of fact, conclusions of law, and dismissal order. This had the effect of suspending or delaying the finality of the findings, conclusions and orders appealed from, which had they not been appealed from within ten days would have become final. 11 U.S.C. § 67(c), and Bankruptcy Rule 803.

The automatic stay of foreclosure having terminated upon entry of the appealed from order of dismissal on August 8, 1979, this district judge upon motion of the debtor stayed foreclosure until September 1, 1979, and because of a remand to the bankruptcy judge to correct a procedural deficiency–

---

1. Cents were omitted in stating and adding amounts.

failure to give notice and hold hearing before dismissal as required by Bankruptcy Rule 12–41–extended that stay by order of August 28, 1979, until ten days after the entry of the bankruptcy judge's order complying with this district judge's remand instructions. The remand order expressly retained jurisdiction of the appeal before the district judge. On October 1, 1979, the bankruptcy judge entered an order reaffirming his order of dismissal. The stay was thereby to expire on October 11, 1979. The debtor moved this district judge to continue the stay of foreclosure and by order a hearing was set for October 18, 1979.

In the manner described in detail in this district judge's order of October 16, 1979, D.C., 2 B.R. 429 at 434, debtor moved this district judge to dismiss the debtor's appeal without prejudice to the expressed right and intention of the debtor to immediately commence a new bankruptcy proceeding in the United States District Court for the District of Maryland under the more liberal provisions of the Bankruptcy Reform Act of 1978 which had become effective. Relying upon the savings clause of the Bankruptcy Reform Act:

"(a) A case commenced under the Bankruptcy Act, and all matters and proceedings in or relating to any such case, shall be conducted and determined under such Act as if this Act had not been enacted, and the substantive rights of parties in connection with any such bankruptcy case, matter, or proceeding shall continue to be governed by the law applicable to such case, matter, or proceeding as if the Act had not been enacted." Section 408 of Pub.L. 95–598, Title IV, Nov. 6, 1978, 92 Stat. 2683. See also 1978 U.S. Congressional and Administrative News at pp. 5806, 5952, 6244 and 6414. this court held that debtor's sole remedy is under the old bankruptcy law, that a dismissal would be with prejudice and that the court was "willing to dismiss the appeal but only with prejudice to the right of debtor to further proceed under the bankruptcy laws–old or new–of the United States. Any other dismissal would be for an imper-

missible purpose and will not be granted by this court." See Bankruptcy Rule 801(b). The October 18 motion to stay hearing was vacated, and the debtor was directed to elect in writing to continue its appeal or to have the dismissal entered with prejudice.

In spite of this district court upon transfer of this Chapter XII proceeding having been vested with "exclusive jurisdiction of the debtor and his property, wherever located...." 11 U.S.C. § 811 (emphasis added), and in spite of the views of this court having been communicated to debtor's counsel on October 16, debtor on October 17 filed a bankruptcy proceeding under the Bankruptcy Reform Act in the United States Bankruptcy Court for the District of Maryland.

Metropolitan Life Insurance Company moved this court to enjoin further proceedings in the United States Bankruptcy Court for the District of Maryland and to transfer that proceeding to this court. Following a hearing this district judge by order dated November 20, 1979, in aid of its exclusive jurisdiction of debtor and its property, wherever located, enjoined the debtor from further prosecution of the Maryland bankruptcy proceedings and from instituting further bankruptcy proceedings in any district other than the Middle District of Georgia and further transferred the Maryland proceeding to this court to be consolidated with this appeal. See entire order as published in 2 B.R. 429.

On November 26, 1979, debtor appealed from this court's injunctive order to the Fifth Circuit Court of Appeals but sought no immediate relief in the form of a stay from this court or the Fifth Circuit Court of Appeals.

Even though this court's injunction was in full force and effect Debtor's attorneys continued to prosecute the Maryland proceeding which ultimately was transferred by the Maryland bankruptcy court to "the United States Bankruptcy Court for the Middle District of Georgia, at Macon, for the purpose of administration of that case in accordance with the provisions of the

Bankruptcy Reform Act of 1978...." Bkrtcy., 2 B.R. 435 and 444 at 451. Upon receipt by the clerk and submittal to Bankruptcy Judge Patterson, an order was entered June 11, 1980, transferring that proceeding, referred to as a Chapter 11 Reorganization filed under the Bankruptcy Reform Act of 1978, to this United States District Court for consolidation with this appeal.

On August 13, 1980, the Fifth Circuit Court of Appeals affirmed this court's injunctive order of November 20, 1979, and dismissed the issues of transfer and consolidation as being interlocutory and not appealable. In so doing the Court of Appeals stated:

> Although normally injunctions are "adversary proceedings," Bankruptcy Rule 701, subject to the procedures in Part VII, the district court had power under the All Writs Act, 28 U.S.C. § 1651, to issue this injunction in aid of its jurisdiction. *See also* Bankruptcy Act § 2a(15); Bankruptcy R. 102, 762, 765, 805; Fed.R. Civ.P. 62(g), 65. *The federal courts in Georgia first acquired the "exclusive jurisdiction of the debtor and his property, wherever located,"* Bankruptcy Act § 411, *and can act to protect that jurisdiction.* The appellate jurisdiction of the district court is the same as that in the bankruptcy proceeding. *Id.* § 416. *See also* Bankruptcy R. 102(a)–(b). Furthermore, a request such as that made by appellee to enjoin a court is properly addressed to the district court. Bankruptcy Act § 2a(15). *See* Record at 158. The cases cited by appellant are inapposite; they involve petitions not in aid of jurisdiction addressed to circuit, not district, courts. *In re Beecher,* 189 F.2d 604 (9th Cir. 1951); *Garlington v. Wasson,* 164 F.2d 243 (5th Cir. 1947), *cert. denied,* 334 U.S. 827, 68 S.Ct. 1337, 92 L.Ed. 1755; *Beecher v. Federal Land Bank of Spokane,* 146 F.2d 934 (9th Cir. 1944); *Amick v. Columbia Casualty Co.,* 101 F.2d 984 (8th Cir. 1939). *See* Bankruptcy Act § 24. The district court therefore had the power, in aid of its jurisdiction, to enjoin the debtor from filing further actions that touched on the

subject *res* during the pendency of the Chapter XII appeal.

624 F.2d 26, 28. (emphasis added).

Metropolitan Life on August 26 moved this court to proceed as to its motion to be permitted to exercise its private power of sale or for alternative relief including requiring debtor to post a supersedeas bond. By order of August 26 the parties were ordered to appear Thursday, September 11, 1980, at 9:30 a. m. for a hearing. On September 10, 1980, at 3:30 p. m. debtor submitted what debtor chooses to call a Plan of Reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978 which provides for the sale of the Macon Hilton Hotel by the debtor through an exchange of unidentified properties, long term financing through issuance of $5,000,000 income tax free revenue bonds by a local industrial authority, and payment of creditors as follows:

(1) Metropolitan Life could elect (a) to be paid all principal and interest due at closing, not to exceed $3,750,000 and to purchase the $5,000,000 industrial bonds, or (b) to be paid its total principal and interest not to exceed $3,400,000.

(2) The First National Bank and Trust Company in Macon as holder of a second security deed would be paid $400,000, an amount it has agreed to accept.

(3) The holders of the third, purchase money, security deed would be paid $25,-000.00.

(4) Unsecured creditors would be paid a total of $59,000 on their total claims of some $90,000.

Article IV of the plan states that Debtor will exchange all its real and personal property "for another property to be designated at a later date...."

During the September 11 hearing the parties were invited to express their views on all possible issues not pending before this court, so that this matter which has been pending before this district judge longer than it should have been can be disposed of fully and finally. For that purpose the debtor was invited to assume an adverse

ruling on the merits of the appeal and to then make an oral motion for a stay pending appeal. The debtor did so.

The court suggested that the Bankruptcy Reform Act being inapplicable and there being no provision for the filing of a new Chapter XII proceeding at this late date, debtor's September 10, 1980, so called Chapter 11 Reorganization Plan if considered, could only be considered by the court as a basis for debtor's motion for stay pending further appeal. Debtor vigorously objected saying that debtor continues to believe the Bankruptcy Reform Act of 1978 applies to the most recently transferred proceeding and that its Chapter 11 plan is properly filed and should be remanded to the Bankruptcy Reform Act–created bankruptcy court of this district because that court, rather than this court has jurisdiction under the Bankruptcy Reform Act. Without abandoning that contention the question was argued by all. During argument debtor's counsel stated to the court that when the hotel property is exchanged by the debtor, the monetary benefit debtor would expect to receive would be some $500,000 of equity in the received property. A possible inequity to Metropolitan Life and to the unsecured creditors was mentioned by the court, and debtor as a result verbally amended its September 10 plan to provide that Metropolitan Life would be paid in full in cash. Debtor did not amend its plan as to unsecured creditors. Metropolitan urges that this September 10 so–called "plan" is nothing more than debtor's hope to sell this property, that its foreclosure should proceed, or that a substantial monetary bond should be required of debtor.

Upon questioning, debtor's attorneys advised that debtors and prospective purchasers of this hotel had been negotiating since May 1980 but had not entered into binding contractual agreements. Debtor's attorneys further suggested that an order of this court affirming this appeal and freeing the property for foreclosure would break up this about–to–be–finalized transaction. To avoid that possibility the court agreed to refrain from ruling until 2:00 p. m., Friday, September 19, 1980, so that debtor and the prospective purchaser would have time to prepare and sign a binding contract and file it with the court to be considered as a part of debtor's motion for a stay. Debtor was also advised that the court's present thinking is that if a new plan supported by a binding contract is submitted, for the plan to be fair to unsecured creditors it should provide for them to be paid 100 cents on the dollar as long as debtor is going to receive some $500,000 of exchanged property equity.

## BANKRUPTCY ACT OF 1898 AND ITS PROVISIONS

### versus

## BANKRUPTCY REFORM ACT OF 1978

Debtor asserts that while its Chapter XII proceeding was commenced under the bankruptcy laws of the United States as they existed on February 17, 1978, the debtor nevertheless had the right following the appeal of the bankruptcy judge's findings, conclusions and orders of July 13, 1979, to dismiss that appeal without prejudice and to proceed anew under the Bankruptcy Reform Act of 1978 when it became effective on October 1, 1979.

The Bankruptcy Act of 1898, as amended, was in effect on February 17, 1978, when the debtor commenced its Chapter XII rearrangement proceeding in the United States District Court for the District of Maryland, and subsequently when the Maryland district court transferred the proceedings to this district court.

Under the Act of 1898, United States District Courts were the "courts of bankruptcy," 11 U.S.C. § 1(10), and referees were officers of the district court to whom bankruptcy matters were referred or certified and whose limited authority and jurisdiction was specified by law. 11 U.S.C. § 66. A referee was:

An officer appointed by the courts of bankruptcy under the act of 1898 (11 U.S.C.A. § 1) corresponding to the "registers in bankruptcy" under earlier statutes having administrative and quasi–judicial

functions under the bankruptcy law, and who assists the court in such cases and relieves the judge of attention to matters of detail or routine, by taking charge of all administrative matters and the preparation or preliminary consideration of questions requiring judicial decision, subject at all times to the supervision and review of the court. *In re Carl Dernburn & Son*, C.C.A.N.Y. [2nd Cir.], 5 F.2d 37, 38. He [was] an officer of the bankruptcy court but not a judge. *Fish v. East*, C.A.A. [C.C.A.] Colo. [10th Cir.], 114 F.2d 177, 200. *His status [was] substantially that of a master* whose findings to extent adopted are considered findings of District Court. *Stewart v. Ganey*, C.C.A. Ala. [5th Cir.], 116 F.2d 1010, 1012.

Black's Law Dict., revised 4th ed. (emphasis added).

Persons aggrieved by a referee's order could file a petition for review by a district judge. 11 U.S.C. § 67(c). The district judge acting for the district court was invested "with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in proceedings under this title ... to–" among other things

\* \* \* \* \* \*

(10) Consider records, findings, and orders certified to the judges by referees, and confirm, modify, or reverse such findings and orders, or return such records with instructions for further proceedings;

\* \* \* \* \* \*

While bankruptcy petitions were routinely referred by the clerk of the district court to a referee, the district judge or judges had the statutory authority to direct otherwise including the specific right "at any time, for the convenience of parties or other cause, [to] withdraw a case in whole or in part from a referee and either act himself or assign the case or part thereof to another referee in the district." Bankruptcy Rule 102(b) and 12–5.

Bankruptcy Rule 901 promulgated in 1973 by the Supreme Court defined the new title "Bankruptcy Judge" to mean "the referee of the court of bankruptcy in which that case is pending, or the district judge of that court when issuing an injunction ... and when acting in lieu of a referee. ..."

Viewed overall the Bankruptcy Act of 1898, as amended, vested total authority and jurisdiction and venue over bankruptcy petitions in United States District Courts and district judges; provided for bankruptcy referees, now called bankruptcy judges, acting somewhat as special masters to hear and decide bankruptcy matters; and for the orders of the referee or bankruptcy judge to be reviewed and then confirmed, modified, or reversed by the district judge. As such the referee or bankruptcy judge was a part of the district court performing a specified function under enumerated powers and duties. The district court, nevertheless, at all times possessed the overall jurisdiction and authority to do anything and everything that the referee or bankruptcy judge could do under the Act of 1898 including the greater authority to act in cases already referenced, see *Warren v. Security–First National Bank of Los Angeles*, 121 F.2d 822 (9th Cir. 1941), to withdraw the reference, to change the reference and to act in lieu of the referee or bankruptcy judge. In addition only the district court and the district judge possessed the equitable power to issue injunctions to restrain a court. 11 U.S.C. § 11(a)(15).

A bankruptcy proceeding commenced in a district court could be transferred by that court to another district court. 11 U.S.C. § 11(a)(19), § 55 and Bankruptcy Rule 116. When bankruptcy petitions are filed in different districts by or against the same parties, "the court in which the first petition is filed ... determine[s] the court or courts in which the case or cases should proceed. ... Thereafter all the courts in which petitions have been filed shall proceed in accordance with the determination." Bankruptcy Rule 116(c). Any district court to which a bankruptcy petition is transferred has jurisdiction of the transferred bankruptcy petition. This is specifically provided for by a 1952 amendment to 11 U.S.C. § 11(a)(1) which added the words "or in any cases transferred to them pursuant to this title" to that section defining persons over whom district

courts as courts of bankruptcy have jurisdiction. *See In re Eatherton*, 271 F.2d 199 (8th Cir. 1959).

In Chapter XII Real Property Arrangements the act of 1898 provided that "the court in which the petition is filed shall, for the purposes of this chapter, have exclusive jurisdiction of the debtor and his property, wherever located." 11 U.S.C. § 811. This statute construed with the said 1952 amendment specifically providing for a transferee district court to have jurisdiction over a transferred case, contemplates that a transferor court having exclusive jurisdiction over a Chapter XII debtor's property, can transfer the Chapter XII proceeding and the transferee court will then have jurisdiction, the same exclusive jurisdiction possessed by the transferor court. To construe § 811 otherwise would mean that the transfer statutes and rules provide for a transfer of some but not all of a bankruptcy proceeding. Such a meaning is obviously inconsistent with the general concept of transfer and with the exclusive jurisdiction concept of § 811 of a debtor and his property. As the Fifth Circuit Court of Appeals said in another case in describing the effect of a transfer:

"The District Court in Florida *relinquished jurisdiction* over the case when it transferred the matter to the Louisiana District Court . . . The transfer . . . simply brought the cause as it was to the transferee court." *In re Miller*, 485 F.2d 74 at 77 (5th Cir. 1973).

*See also*, 15 A.L.R.Fed. 511 at 521–523.

A bankruptcy proceeding referenced to a referee or bankruptcy judge that is before a district court as an appeal pursuant to Rule 801, is not subject to voluntary dismissal by the appellant except in specified circumstances not here applicable. In addition the Rule provides "[a]n appeal may also be dismissed upon motion of the appellant upon terms agreed upon by the parties or fixed by the court." This rule clearly does not contemplate that an appellant absent agreed upon terms can unilaterally dismiss an appeal pending before a district court except upon terms fixed by the district court.

In enacting the Bankruptcy Reform Act of 1978 to become effective on October 1, 1979, Congress clearly and unambiguously stated the extent to which the Bankruptcy Reform Act of 1978 would apply to pending bankruptcy proceedings. It provided in Section 403 of Public Law 95–598, Title IV, Nov. 6, 1978, 92 Stat. 2683, that:

(a) A case commenced under the Bankruptcy Act, and all matters and proceedings in or related to any such case, shall be conducted and determined under such Act as if this Act had not been enacted, and the substantive rights of parties in connection with any such bankruptcy case, matter, or proceeding shall continue to be governed by the law applicable to such case, matter, or proceeding as if the Act had not been enacted.

"Bankruptcy Act" refers to the Bankruptcy Act of 1898, as amended. The words "this Act" refer to the Bankruptcy Reform Act of 1978. Substituting those words Congress thus in effect said: A case commenced under the Bankruptcy Act of 1898, as amended, and all matters and proceedings in or relating to any such case, shall be conducted and determined under the Bankruptcy Act of 1898, as amended, as if the Bankruptcy Reform Act of 1978 had not been enacted, and the substantive rights of parties in connection with any such bankruptcy case, matters, or proceedings shall continue to be governed by the law applicable to such case, matter, or proceeding as if the Bankruptcy Reform Act of 1978 had not been enacted.

Congress having plainly expressed its intentions, cases commenced under the Bankruptcy Act of 1898, as amended, and all matters and proceedings in or relating to such cases are to be decided as if the Bankruptcy Reform Act of 1978 had not been enacted—did not even exist.

## THE BANKRUPTCY ACT OF 1898 APPLIED TO THIS CASE

While this Chapter XII Real Property Arrangement bankruptcy proceeding commenced under the Bankruptcy Act of 1898

in United States District Court for the District of Maryland as a court of bankruptcy, and that district court then had exclusive jurisdiction of the debtor and its property, wherever located, the transfer of this bankruptcy proceeding to this district court transferred the entire proceeding including exclusive jurisdiction of the debtor and its property, wherever located, to this court. As the Fifth Circuit Court of Appeals stated, "... The federal courts in Georgia *first acquired this exclusive jurisdiction* of the debtor and his property, wherever located...." 624 F.2d at 28. (emphasis added).

Under reference to Referee (then called Bankruptcy Judge) Patterson, this United States District Court as a court of bankruptcy, continued to have the exclusive jurisdiction of the debtor through and including the filing on July 13, 1979, of the bankruptcy judge's findings and conclusions and order of dismissal. Appeal by the debtor to a district judge prevented the order of dismissal from becoming final and this court's exclusive jurisdiction from terminating. On appeal to a district judge, this court's exclusive jurisdiction of the debtor and its property, wherever located, continued and was the basis–as the Fifth Circuit Court of Appeals decided–for this court enjoining debtor on October 16, 1979, from proceeding under the bankruptcy laws–old or new–in any United States District Court other than this court.

■ On October 17, 1979, when debtor nevertheless commenced what debtor hoped would be a Chapter 11 Bankruptcy Reform Act of 1978 proceeding in the United States Bankruptcy Court in Maryland, that proceeding in spite of the views of a bankruptcy judge of that court to the contrary, was a nullity because as to this debtor whose bankruptcy proceeding had commenced and was still proceeding under the Bankruptcy Act of 1898, the Bankruptcy Reform Act did not exist and could not therefore be the basis for a new proceeding. Instead of dismissing that proceeding for want of jurisdiction, the Maryland bankruptcy court transferred the proceeding to the bankruptcy court of this district and that court then

transferred it to this district court; viewed alternatively, the Maryland proceeding had already been transferred to this district court by this district court's order of October 16. That every court involved elected to transfer the Bankruptcy Reform Act proceeding to this district court makes it unnecessary to determine the question of which transferor court had the authority to transfer. That question is moot.

The proceeding that debtor attempted to begin under the Bankruptcy Reform Act having thus been transferred to this district court, it is this district court's responsibility to examine its jurisdiction of that proceeding.

The only asserted basis of alleged jurisdiction of the Bankruptcy Reform Act proceeding in the Maryland bankruptcy court and after transfer in the bankruptcy court of this district, is the Bankruptcy Reform Act of 1978 which did not become effective until October 1, 1979. As heretofore stated, that Act as to this debtor did not exist because the debtor had commenced a bankruptcy proceeding under the Bankruptcy Act of 1898. As to this debtor's proceeding it was as if the Bankruptcy Reform Act "had not been enacted." Being non–existent as to this debtor, the Bankruptcy Reform Act could not, indeed did not confer jurisdiction on the Maryland bankruptcy court or the bankruptcy court of this district to do anything other than determine whether or not it had jurisdiction of the debtor under the Bankruptcy Reform Act. Neither court made such a determination; instead, each court "passed the buck" to this court. Upon transfer this court is faced with the question of its jurisdiction. Having heretofore determined that the pendency of the February 17, 1978, Chapter XII Real Property Arrangement proceeding which commenced under the Bankruptcy Act of 1898, precludes debtor from proceeding under the Bankruptcy Reform Act of 1978, see *In Re Geiger Enterprises, Inc.*, D.C., 4 B.R. 444, and any court from having jurisdiction of debtor and its property under that Act, there is no basis for this court's jurisdiction, and that proceeding known as

Civil 80–151–Macon, must be and is therefore dismissed for lack of jurisdiction.

### APPEAL OF THE JULY 13, 1979, FINDINGS, CONCLUSIONS and ORDER

Civil 80–15–Macon, the Bankruptcy Reform Act proceeding, having been dismissed for lack of jurisdiction, the sole question before the court is whether this district court should affirm, modify or reverse the bankruptcy judge's July 13, 1979, findings, conclusions and order appealed from or remand the records to the bankruptcy judge with instructions for further proceedings. 11 U.S.C. § 11(a)(10). In making its determination this district court is required by Bankruptcy Rule 810 to "accept the referee's (now bankruptcy judge's) findings of fact unless they are clearly erroneous, and . . . [to] give due regard to the opportunity of the referee to judge of the credibility of the witnesses."

### (a) *Findings of Fact*

Debtor's brief to this court upon appeal does not suggest that the Bankruptcy Court's findings of fact are erroneous. Having nevertheless closely examined the entire record of this proceeding and compared the evidence to the ten pages of the bankruptcy judge's findings of fact, this district court "giving due regard to the opportunity of the referee to judge of the credibility of the witnesses", Bankruptcy Rule 810, finds none of those findings of fact to be erroneous and accepts them in their entirety.

While the findings of fact are attached for purposes of further consideration it is noted that debtor's proposed second modified plan of real property arrangement as to Metropolitan Life and unsecured creditors provides in sum and substance:

(1) For Metropolitan Life Insurance Company's first security deed loan on which the March 1, 1979, principal and accrued interest balance was $3,236,619, and which is a 7¾% interest, payment of $26,042.50 per month loan having a final maturity date of May 1, 1986 to be rearranged and exchanged for a new first mortgage under which from date of confirmation until January 1, 1989, Metropolitan would receive monthly payments of $5,000 in 1980 with those monthly payments increasing by $2,500 per month each year through 1988 at which time Metropolitan would be receiving $25,000.00 per month. In addition on each January 2, 1984 thru January 2, 1988, Metropolitan would receive $30,000.00. Applying all payments to the debt to Metropolitan, on December 31, 1988, Metropolitan will still be owed $3,702,366 or $465,747 more than its March 1, 1979 balance.

(2) On January 1, 1989, Metropolitan will again receive in exchange a new first mortgage providing for monthly payments at 8% interest amortized over thirty years. Metropolitan will thus receive final and full payment in January 2019 instead of in 1986 as its secured debt calls for.

(3) For unsecured creditors to receive either 50% of their claims in cash on date of confirmation or 100% of their claims payable 20% on January 2, 1980, and each January 2 thereafter, without interest, until paid in full.

### (b) *Conclusions of Law*

Debtor suggests in its brief that "the crux of the findings of Judge Patterson appear to be that in his opinion, as a matter of fact and as a matter of law, the Plan proposed by the Debtor is not feasible and at the same time, does not provide adequate protection to Metropolitan, all of which apparently led to Judge Patterson's decision to dismiss the case . . . ." These conclusions are fallacious in Debtor's opinion because Judge Patterson "used the wrong statutory and case law test for adequate protection when applying it to Debtor's Plan . . . ." Metropolitan's debt as rearranged, it contends, is adequately secured and satisfies the adequate protection requirements of 11 U.S.C. § 861(11). These conclusions are also fallacious in Debtor's opinion because "[w]ith respect to the question of feasibility, the evidence taken as a

whole, and with the Court being bound to consider only evidence before it, clearly demonstrates that the Debtor's plan is feasible as required by Sec. 472(2). [11 U.S.C. § 872(2)]. The Debtor's exhibits 3 and 4 presented at the confirmation hearing employ various conservative projections which are substantiated by the forecast prepared by Mr. Watson (T. 177, 187) and so provide an additional "margin of safety" with regard to the Debtor's ability to make the required payments. As noted earlier, the testimony disclosed that the figures for January and February, 1979 reflect significantly greater revenues than those projected (T. 28)."

Metropolitan Life with equal vigor urges the affirmation of the bankruptcy judge's conclusions.

█ Having carefully weighed authorities relied upon by Debtor, this district court is of the considered opinion that the bankruptcy judge's conclusions of law are well founded and correct, that there is no occasion for this district judge to prepare another complex opinion reaching the same result for the same reasons and that accordingly the conclusions of law together with the resulting order of dismissal, and the findings of fact already found not to be erroneous, should be AFFIRMED as stated by the bankruptcy judge. *See Wachovia Bank & Trust Co. v. Harris*, 455 F.2d 841 (4th Cir. 1972).

## MOTION FOR A STAY PENDING APPEAL TO THE FIFTH CIRCUIT COURT OF APPEALS

The affirmance by this district court of the bankruptcy judge's findings of fact, conclusions of law, and order of dismissal means as a practical matter that unless this court's order of affirmance is appealed to the Fifth Circuit Court of Appeals and unless an order staying or halting Metropolitan Life's right of non–judicial foreclosure is issued by this district court or by the Fifth Circuit Court of Appeals, Metropolitan Life can now proceed to advertise once a week for four weeks and sell the Hilton Hotel real property on the first Tuesday of the first month after advertisement.

Rule 8 of the Federal Rules of Appellate Procedure requires that a motion for a stay pending appeal "must ordinarily be made in the first instance in the district court . . ." before making such a motion to the court of appeals.

Contemplating that debtor would desire to satisfy this requirement by moving this court for a stay pending appeal and feeling strongly that further delay occasioned by debtor filing further motions and briefs to be heard and considered would not be fair or equitable to these creditors who have received "not the first red cent" since before February 17, 1978; the debtor was invited to assume affirmance by this court, make an oral motion for a stay pending appeal and state the basis therefor. As mentioned, Debtor did so on September 11, 1980. Since then debtor has submitted additional information and briefs in support of its motion and Metropolitan Life has submitted its brief in opposition thereto.

Rule 8 permits a stay to be "conditioned upon the filing of a bond or other appropriate security in the district court. . . ." While Metropolitan opposes debtor's motion for a stay pending appeal, it urges alternatively that if a stay is granted it be conditioned upon the giving of a bond in the amount of at least $649,620.72 representing accrued interest through September 10, 1980, plus two years' interest at $631.56 per day for the period of time Metropolitan suggests it will take an appeal in the Fifth Circuit Court of Appeals to be finally decided.

Debtor asserts that it is financially unable to furnish any substantial bond. No verified financial statements having been furnished this court since May 31, 1978, the court can only assume the truth of debtor's assertion and conclude that it is pointless to consider what amount of bond to require of a debtor who is unable to furnish any substantial amount.

█ While normally the criteria that must be found by the court for a stay to be

granted pending appeal are: (1) irreparable injury to the movant unless the stay is granted; (2) no substantial harm to other interested persons if the stay is granted; (3) no harm to the public interest from the granting of a stay, and (4) the likelihood that movant will prevail on the merits of an appeal, *Beverly v. United States,* 468 F.2d 732 (5th Cir. 1972); *Fortune v. Molpus,* 431 F.2d 799 (5th Cir. 1970); *Pitcher v. Laird,* 415 F.2d 743 (5th Cir. 1969), this motion is urged not because movant will most likely prevail on the merits of its appeal but because movant believes a sale by exchange of debtor's property has been arranged for. Debtor's suggestion is that such a sale satisfies the requirements of a Chapter XII plan, should be considered by the court as an amended Chapter XII plan, and should be sanctioned by the court as a confirmed Chapter XII plan or as a basis for the exercise of the court's discretion to grant a stay pending appeal.

The bankruptcy rules were first prescribed pursuant to 28 U.S.C. § 2075 by the Supreme Court of the United States on April 24, 1973, to take effect on October 1, 1973. While as heretofore discussed, the district court as a court of bankruptcy has the power and the authority not only to refer a bankruptcy proceeding to a Referee (now called Bankruptcy Judge), but also to withdraw the reference and even to act as to matters already referred, Bankruptcy Rule 810 seems to this court to contemplate that as of the effectiveness of the bankruptcy rules, the district court in considering an already referred bankruptcy proceeding upon an appeal is limited to either affirming, modifying, reversing, or remanding the proceeding with instructions for further proceedings. These limitations do not contemplate that the district court in considering an appeal will start the bankruptcy proceeding anew. As previously pointed out, Rule 810 further provides:

"The court shall accept the referee's findings of fact unless they are clearly erroneous, and shall give due regard to the opportunity of the referee to judge of the credibility of the witnesses."

This sentence confirms such a construction of the role of the district court upon an appeal and makes it crystal clear that it is the Referee's (now Bankruptcy Judge) findings of fact that are being reviewed. It is not for the district judge to disregard those findings of fact and make his own findings of fact.

Debtor's September 19, 1980, Plan to sell the Hilton Hotel, as filed with this court, is in reality a motion that the district court while considering this appeal start this bankruptcy proceeding anew, withdraw the reference, make its own findings of fact, and confirm debtor's September 19, 1980, plan. Believing that the Bankruptcy Act of 1898, as amended, and construed in light of Rule 810, does not contemplate such action by this district court, this court refused to consider debtor's plan as an amended new Chapter XII Plan. Even if the bankruptcy law and rules contemplated this district court starting this matter anew, for the reasons hereinafter stated it is the view of this court that debtor's September 19, 1980, plan is not a real property arrangement within the contemplation of the requirements of Chapter XII of the Bankruptcy Act of 1898.

Debtor's plan to sell the Hilton Hotel's real and personal property by exchange was filed at 3:30 p. m., September 10, 1980, and discussed in open court the following morning. As discussed, amended, and further clarified, Debtor's plan proposes:

(a) The issuance of $7,000,000 industrial authority revenue bonds secured by a first deed to secure debt on the Hilton Hotel.

(b) On December 1, 1980, for Metropolitan Life to be paid its entire balance of principal and interest in the amount of $3,583,314, but no attorneys' fees as provided in the deed to secure debt.

(c) On December 1, 1980, for second security deed holder First National Bank & Trust Company in Macon to be paid

$400,000 as agreed upon satisfaction on its second security deed and note.

(d) On December 1, 1980, for third security deed holder Greater Macon Developments, Inc. to be paid $25,000 which the court was advised will be in satisfaction of the third security deed and note.

(e) On December 1, 1980, for $66,000 past due ad valorem taxes to be paid.

(f) On December 1, 1980, for unsecured creditors to be paid $59,000 of the total of some $90,000 owed them by debtor.

(g) On December 1, 1980, for $25,000 unpaid personal property taxes to be paid.

(h) That payments (a) through (g) *will liquidate all outstanding liabilities of debtor.*

(i) On December 1, 1980, for debtor in exchange for transfer of its real and personal property subject to payment of the aforesaid amounts, to receive another tract or piece of real property in which debtor's attorneys estimate debtor will then have at least a $500,000 equity. No detailed financial details having been furnished to the court, it is impossible to determine whether debtor will benefit more or less than $500,000.

(j) Debtor will pay $15,000 commission to one broker and $25,000 to another. Purchaser will also pay $25,000 commission.

(k) Purchaser will pay as the cash portion of the purchase price of the property to be exchanged, $416,686 plus any amounts deposited in escrow by debtor.

(*l*) Conditions Precedent described as:

"4. *Conditions Precedent.*

(a) The obligations of both parties under the Contract of Exchange shall be conditioned upon all of the following:

(1) A confirmed plan of arrangement or reorganization which effectively terminates all pending Bankruptcy proceedings involving Uplands and the Premises or a dismissal of all pending bankruptcy proceedings involving Uplands and the Premises; in either case, without any objections being filed thereto by secured creditors who are parties in interest to such Bankruptcy proceedings;

(2) Cancellation of the Hilton Franchise Agreement affecting the Premises and consent of Hilton Inns, Inc. to the establishment of a franchise other than Hilton on the Property;

(3) Releases liquidating all outstanding liabilities relating to and liens upon the Premises, in exchange for payments totaling, in the aggregate, $4,158,314.00, as particularized in paragraph 2;

(4) The refund from Metropolitan Life Insurance Co. of the Twenty–Five Thousand Dollars ($25,000.00), plus interest, if any, less any deductions authorized by Uplands, which refund shall become the property of Uplands; and

(5) The approval, issuance, validation and sale of seven million dollars face value of Development Authority of Bibb County, Georgia Revenue Bonds ("the Revenue Bonds") to finance LICO–SUHOCO's acquisition and improvement of the Premises with five million dollars face value of the Revenue Bonds to be secured by a first mortgage on the premises with no personal liabilities on the part of LICO–SUHOCO or its Partners or affiliates, and with all other terms and conditions (including but not limited to term, call provisions and interest rate) of such Revenue Bonds and the sale of such Revenue Bonds to be satisfactory to LICO–SUHOCO, in its sole discretion;

(b) All conditions precedent provided for in this paragraph 4 shall continue up to the date of Closing and shall be and/or remain fulfilled on the date of Closing. In the event that any of these conditions precedent are not fulfilled as of the date of Closing, this agreement shall be null and void.

5. *Contingency Regarding a Commitment to Purchase the Revenue Bonds.*

As a further condition precedent to this Contract of Exchange, LICO–SU-HOCO shall, no later than October 15, 1980, obtain a written commitment on the part of one or more persons or entities to purchase seven million dollars face value of the Revenue Bonds, with such commitment[s] to be contingent only upon the approval, validation and issuance of the bonds in accordance with requirements of paragraph 4(a)(5) and upon opinion of counsel regarding the tax exempt nature of the bonds, and such other contingencies that are customary for financing commitments of the type described herein. Evidence of such written commitment must be transmitted to Uplands. In the event that this condition is not satisfied by October 15, 1980, then either party shall have the power to terminate this Contract of Exchange by serving written notice to such effect upon the other, no later than October 22, 1980 and thereupon neither party shall have any rights or obligations hereunder.

"The purpose of Chapter XII [of the Bankruptcy Act of 1898 as amended in 1938 by the Chandler Act] is to restore, not to dismantle, the economically distressed debtor. . . ." *In Re Colonial Realty Investment Co.,* 516 F.2d 154, 158 (1st Cir. 1975).

While Chapter XII in 11 U.S.C. § 861(1), (11) and (12) specifies inclusion of "provisions modifying or altering the rights of creditors who hold debts secured by real property;" that an arrangement shall provide adequate protection for classes of creditors that do not accept the plan; and that adequate means may include "the sale of all or any part of his property . . . at not less than a fair upset price. . . ." (12) goes on to provide for "the *distribution of all or any assets, or the proceeds derived from the sale thereof,* among those having an interest therein. . . ."

Chapter XII thus seems to contemplate an arrangement or plan that is a sale of all of debtors property and a distribution of all of the proceeds to debtor's creditors, each getting his fair, lawful share. It does not, however, seem to contemplate through an arrangement or plan for a sale and exchange of all of debtor's properties, that debtor will retain some $500,000 of the proceeds of the sale and exchange in the form of equity in the received property and that the proceeds less debtor's $500,000 will be distributed to creditors.

▪ Chapter XII does not contemplate that a United States District Court as a court of bankruptcy will confirm such an arrangement, thereby forcing creditors to accept less than they are due from the sale proceeds and permitting debtor at the expense of its creditors to retain a substantial profit of some $500,000. As such what debtor urges upon this court as a so–called Chapter XII plan or arrangement, is not a Chapter XII plan or arrangement. As its contents clearly indicate, it is nothing more than a proposal to liquidate–to dismantle–debtor's Hilton Hotel operation with substantial profit to debtor and substantial loss to debtor's creditors.

If debtor were to submit an amended plan for the sale of all of its property at not less than a fair upset price, the distribution of all of the proceeds derived from the sale to its creditors, and retention by the debtor of only such amounts as are not needed to pay its creditors in full, this court would view such amended plan as an arrangement within the contemplation of Chapter XII, would grant a stay and would remand the entire proceeding, including the amended plan, to the bankruptcy judge for submission to debtor's creditors and possible confirmation. Debtor, of course, has submitted no such amended plan or arrangement, and accordingly this court will not grant debtor's motion for a stay pending appeal.

The July 23, 1979, findings of fact, conclusions of law, and order of dismissal of the bankruptcy judge are AFFIRMED. Debtor's motion for a stay pending appeal to the Fifth Circuit Court of Appeals is DENIED.

## APPENDIX "A"

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| In the Matter of: | In Proceedings for an Arrangement Under Chapter XII |
| MACON UPLANDS VENTURE, A Limited Partnership, | Case No. 78-292-Mac<br>Filed July 13, 1979 |
| | MEMORANDUM DECISION ON OBJECTION TO CONFIRMATION OF CHAPTER XII ARRANGEMENT |
| Debtor | |

For determination is whether or not Macon Uplands Venture, a limited partnership, (debtor) should be granted relief under Chapter XII, Section 461(11)(d) of the Bankruptcy Act, from the nonjudicial foreclosure under the powers in the security deed held by Metropolitan Life Insurance Company, hereinafter referred to as Metropolitan, holder of the first security lien against the real property known as the Macon Hilton Hotel (Hilton). From the pleadings, transcript, and documentary evidence, the Court makes the following

### FINDINGS OF FACT

The debtor is a limited partnership. The general partner, Uplands, Inc., is a Maryland corporation. The limited partners are individuals each of whom is a resident of the State of Maryland. The sole asset of this partnership is the real property, improvements thereon, and furniture and fixtures, and is known as the Macon Hilton Hotel.

The First National Bank & Trust Company in Macon was the holder of a promissory note dated September 30, 1968 in the principal sum of $3,300,000. On the same date a security deed was executed transferring the Hilton to the bank as security for the promissory note.

The Hilton began operation in 1970 under the management of the Hilton Hotel Corporation.

On December 21, 1970 the said security deed was amended. The amendment provided for interest at the rate of 7¾ percent per annum, a maturity date of May 1, 1986, and monthly installments of $26,042.50. Monthly payments were amortized over a twenty–two–year period. On the same date of the amendment to the security deed, the promissory note and the amended security deed were transferred without recourse to Metropolitan Life Insurance Company. For reference purposes the amended security deed is hereinafter referred to as the "original security deed."

Monthly taxes and insurance are due in the sum of $7,305.00, subject to fluctuation from year to year, or a total monthly payment for debt service, taxes, and insurance in the sum of $33,347.50.

Interest accrues on the debt daily at the rate of $631.56, monthly at the rate of $18,946.76, and annually at the rate of $227,361.12.

The Hilton was purchased from Metropolitan by Uplands, Inc. in September 1972. On January 1, 1973 Uplands, Inc. transferred the Hilton by quitclaim deed to Macon Uplands Venture, the limited partnership. Neither Uplands, Inc. nor the limited partners individually assumed any corporate or personal liability on the purchase of the Hilton.

The Hilton is a 307–room, 16–story hotel located in the downtown area of Macon, Georgia. The facilities include fifteen areas designed specifically to accommodate groups for banquets, conventions, seminars, etc. Located on the premises are a restaurant, coffee shop, cocktail lounge, swimming pool, underground parking area, and a parking garage. The debtor operates under a franchise agreement with the Hilton Hotel Corporation.

The Hilton is not readily accessible to Interstate 75 and 16. It does not get its share of tourist or transient business because of Interstate 475 by–pass and accessibility of motels to Interstate 75 and 16. The Hilton's operation depends primarily on group room nights (conventions, etc.) for financial survival.

The Hilton has never been a profitable operation. At one point in time the break-even point would require a 55 percent occupancy. That goal has never been accomplished. Between 1973 and 1978 inclusive, the occupancy rate ranged from a low of 38.9 percent to a high of 44.3 percent. In 1978 there was an increase in room rates to a high of $24.46. The projected occupancy for 1978 was 48.2 percent. Actual occupancy was 38.7 percent, or a 9.5 percent decrease in occupancy over projection.

The Hilton is one of five hotels owned by Uplands, Inc. or partnerships. The five hotels are operated under a management corporation known as Metropolitan Hotels, Inc., a corporation under the same ownership as the hotels. Income from the five hotels is channelled into Metropolitan Hotels, Inc., and expenses of the hotels are paid from the pooled funds. By this procedure, the income from the profitable hotels is used to subsidize less profitable hotels in the inter-company operation. Metropolitan Hotels, Inc., has subsidized the operation of the Hilton to the tune of $1,174,677.99 over a period of five years six months.

After four forbearances from payment by Metropolitan, the debtor subsequently defaulted in payments of principal and interest to Metropolitan. The debtor's last payment on the principal sum was made in September 1976, representing the August 1976 installment. No money has been paid on interest since December 1977.

Metropolitan accelerated its debt and began nonjudicial foreclosure under the powers in its security deed. On February 17, 1978 the debtor filed for relief under Chapter XII of the Bankruptcy Act in the United States District Court in Maryland. The filing of the Chapter XII case stayed the nonjudicial foreclosure proceedings. On hearing after notice, the case was transferred to and filed with the United States District Court for the Middle District of Georgia, Macon Division, on April 18, 1978.

A first meeting of creditors came on for a hearing on June 19, 1978. Subsequently, the original arrangement was twice modified with the last modification filed February 16, 1979, hereinafter referred to as the "plan." The plan provided for ten classes of creditors. Of the ten classes, four were priority, three were secured, one unsecured, one inter-company, and administrative claims and costs. Of the five voting classes, Metropolitan, Class 5, and the unsecured creditors, Class 8, being affected thereby, rejected the debtor's plan.

The Hilton is encumbered by three security liens. Metropolitan Life Insurance Company is the first security lienholder and has a claim for $3,236,619 (principal $2,933,694; accrued interest $302,925) as of March 1, 1979. The First National Bank & Trust Company in Macon (Class 6) is the second security lienholder and has a claim for $2,455,422.51, plus accrued interest after June 19, 1978. Greater Macon Developments, Inc. (Class 7) is the third security lienholder and has a claim for $750,000.

Metropolitan's security lien is dated December 21, 1970, and matures May 1, 1986. The security lien is for a period of fifteen years five months. At the time the debtor filed the Chapter XII proceedings on February 17, 1978, eight years two months thirteen days remained before the maturity date.

The debtor's plan substantially altered and modified Metropolitan's contractual rights. It provides for the debtor to issue two new security instruments: one on confirmation of the plan, and the other on January 1, 1989.

On confirmation Metropolitan shall receive in exchange for its original security deed dated December 21, 1970 a new security deed, hereinafter referred to as "first mortgage," for the sum of $3,000,639.89, representing principal and accrued interest to February 17, 1978. The total sum due Metropolitan as of March 1, 1979 was $3,236,619. As of March 1, 1979 the proposed first mortgage was $235,980 less then the sum the debtor owed Metropolitan. (All figures are rounded off to dollars.)

The plan does not provide for interest to accrue on the first mortgage. There is no provision for interest payments from the

date of the filing of the Chapter XII case on February 17, 1978 to January 1, 1989. This constitutes a period of ten years ten months fourteen days. Metropolitan's original security deed bears interest at 7¾ percent per annum. At said rate Metropolitan would, therefore, sustain a loss of interest under its original security deed in the sum of $2,735,948.50. Principal and interest due Metropolitan as of December 31, 1989 will amount to $5,472,336.

Payments under the proposed first mortgage are to be made as follows:

No payments will be made until January 1980. Beginning January 1, 1980 monthly payments will be made as follows:

| Year | Payments Due on the First of Each Month | Annual Payment |
|------|------|------|
| 1980 | $ 5,000 | $ 60,000 |
| 1981 | 7,500 | 90,000 |
| 1982 | 10,000 | 120,000 |
| 1983 | 12,500 | 150,000 |
| 1984 | 15,000 | 180,000 |
| 1985 | 17,500 | 210,000 |
| 1986 | 20,000 | 240,000 |
| 1987 | 22,500 | 270,000 |
| 1988 | 25,000 | 300,000 |

or payments over a nine–year period in the sum of $1,620,000.

On January 2, 1984 through January 2, 1988 inclusive, Metropolitan will receive an additional sum of $30,000 each year, or a total sum of $150,000. Applying the proposed payments of $1,770,000 to principal and interest in the sum of $5,472,336, there will be outstanding to Metropolitan the sum of $3,702,336 as of December 31, 1988.

In addition to the above proposed payments, Metropolitan will receive a sum in excess of the proposed payments to The First National Bank & Trust Company, Class 6 creditor, as established by a formula, provided the security interest in the Hilton of the Class 6 creditor is less than the amount of its debt. The plan provides for payment to the Class 6 creditor as follows:

(1) For the calendar year 1979, 20 percent of the net cash flow of the operation of the hotel after debt service to Metropolitan not to exceed the amount of interest due for the year, but not less than $20,000.00.

(2) For the calendar year 1980 and continuing through and including the calendar year ending December 31, 1988, 20 percent of the net cash flow of the operation of the debtor not to exceed the amount of interest due for the year, but not less than $20,000.00.

(3) Beginning with the calendar year 1989 and continuing thereafter until the mortgage is fully paid, 40 percent of the net cash flow after debt service to Metropolitan, but not less than $40,000.00 for any calendar year.

Based upon the above proposed payments, the sum due the Class 6 creditor is computed on a mathematical formula consisting of a fraction, of which the numerator is the amount by which the value of the collateral (Hilton) exceeds the claim of Metropolitan, and the denominator is the total amount of the claim of the Class 6 creditor, the second security lienholder. Percentage-wise, the formula is the ratio between the security interest the Class 6 creditor has in the Hilton and the total amount of its claim. After computing the amount due the Class 6 secured creditor, any excess will be paid to Metropolitan. Such sum is merely conjectural. As will hereinafter be shown, the third security lienholder, Greater Macon Development Corporation, Class 7 secured creditor, has no security interest in the Hilton.

Under the plan the debtor seeks a moratorium on payment of the principal sum due Metropolitan from the last payment in September 1976 to January 1, 1989.

On January 1, 1989 the debtor will execute a "second mortgage" to Metropolitan in exchange for the first mortgage. The face amount of the second mortgage will be in the sum of $3,702,336, bearing interest at eight percent annually on the decreasing balance and amortized over a thirty–year period.

Metropolitan's original mortgage dated December 21, 1970 is for the principal sum of $3,300,000. Under the debtor's proposed plan, after approximately eighteen years the face amount of the second mortgage

will exceed the amount of the original mortgage by $402,336.

The debtor's proposed plan extends the time for payment of the second mortgage from January 1, 1989 for an additional thirty–year period to January 1, 2019. The debtor began operating the Hilton on January 1, 1973. By extending Metropolitan's mortgage from its maturity date of May 1, 1986 to the year 2019, Metropolitan would be holding the debtor's mortgage on the Hilton for a period of thirty–two years eight months. From December 21, 1970 to the year 2019, the Hilton will have been under mortgage to Metropolitan for a period of forty–eight years. Forty years ten months fourteen days will lapse between the date of the filing of the Chapter XII case on February 17, 1978 to the year 2019. The expert testimony of the debtor is that the economic life of this type of hotel is twenty–five to thirty years. The debtor's plan of payment to Metropolitan extends beyond the economic life of the Hilton. Metropolitan's debt will exceed the economic life of the Hilton by a period of time not less than eighteen years nor more than twenty–three years.

The Hilton has been valued by the expert witness of the debtor. Valuation is predicated on five conditions: Firstly, an investment of $245,000 to replace some of the furniture and linens, refurbish, and make needed repairs to the inside and outside of the building; secondly, a turnaround of the business operations within five years to effectively compete within the market place; thirdly, a room rate of $28.00 per day; fourthly, a stabilized room occupancy of 45 percent; and fifthly, a capitalization of prospective earnings at 11 percent. On these conditions the Hilton has a going concern value of $4,500,000, a liquidation or bid price or current fair market selling price of $3,660,000, and a loan value of $3,375,000. Unequivocally, each value exceeds the amount of Metropolitan's security interest as of March 1, 1979.

The current interest rate on mortgages for hotel investment is 10½ percent per

annum. The debtor's plan provides for a second mortgage to issue on January 1, 1989 bearing interest at eight percent per annum. This constitutes a one–fourth interest rate increase over the original security deed transferred to Metropolitan on December 21, 1970.

The projected five year turnaround period is based on a stabilized income approach. It is computed on 302 rooms available for rent at a daily rate of $28.00 and a 45 percent occupancy rate for 365 days a year. The 45 percent rate has never been accomplished at a daily rental rate of $24.46 or less. Of the five year turnaround period, operating losses would occur in the first three years; profits would not be realized until the fourth year.

The debtor's appraiser has never been able to project ten years ahead as there are too many things that prohibit it. In the forty–year–ten–month–fourteen–day span of time between February 17, 1978 to the year 2019, we have a hypothetical forecast that after a five–year–turnaround period, if accomplished, the net profit, excluding debt services, will be sufficient to pay Metropolitan's debt service. (R–190) There remains thirty–five years ten months on which there is no projection of the amount of net income to satisfy Metropolitan's debt service.

## CONCLUSIONS OF LAW

This litigation began when Metropolitan initiated nonjudicial foreclosure of the Hilton by sale under contractual powers in its deed with power of sale to secure debt. To stay the foreclosure, the debtor initiated the Chapter XII case by filing a voluntary petition under Section 422 of the Bankruptcy Act [11 U.S.C.A. 822], through which the Bankruptcy Court obtained exclusive jurisdiction over the debtor and its property, wherever located. Section 411 of the Act [11 U.S.C.A. 811]. A real property arrangement is designed to grant relief to and provide a means for financial rehabilitation of debtors, other than corporations,[1] who are insolvent or unable to pay debts as they

1. Section 406(6) of the Act [11 U.S.C.A. 806(6)].

mature,[2] and whose debts are secured by real property or a chattel real.[3] A Chapter XII arrangement primarily involves creditors having a security interest in the debtor's real property or a chattel real, and may include all creditors, secured and unsecured.[4] The statutory scheme is to keep the debtor in business during an arrangement proceeding until final disposition of the plan of arrangement. It is designed to cope with the problems of delinquencies on secured obligations on real property or a chattel real. Subject to Sections 461(11) and 472 of the Act, the plan of arrangement is essentially a matter of getting additional time to pay in full, a composition, or a combination of extension and composition.

A real property arrangement can be employed only when the proposed plan has as its primary purpose the "alteration or modification" of the rights of creditors holding security interest in real property or a chattel real of which the debtor is the legal or equitable owner. Bankruptcy Act § 406(1) [11 U.S.C.A. 806(1)]. Creditors shall be deemed to be "affected" by an arrangement only if their or its interest shall be "materially and adversely" affected thereby. Bankruptcy Act § 407 [11 U.S.C.A. 807]. Creditors not affected by the plan of arrangement do not have to be dealt with, and have no voice in the acceptance or rejection of the proposed plan of arrangement. See Bankruptcy Rule 12–37(d); Act § 466 [11 U.S.C.A. 866], § 467 [11 U.S.C.A. 867], § 468(1) [11 U.S.C.A. 868(1)].

An arrangement which has been accepted by all creditors affected thereby shall be confirmed by the court subject to certain conditions which are not applicable in the case sub judice. Bankruptcy Act § 467 [11 U.S.C.A. 867]. If an arrangement has not been accepted by all creditors, an application for confirmation may be filed within the time fixed by the court where the arrangement has been accepted in writing by creditors of each class, holding two–thirds in amount of the debts of such class affected by the arrangement proved and allowed, exclusive of creditors or of any class of them who are not affected by the arrangement, or for whom payment or protection has been provided as prescribed in Section 461(11) of the Act. Bankruptcy Act § 468 [11 U.S.C.A. 868].

Nonaccepting creditors who are affected and whose interests have been altered or modified are subject to extensive litigation dictated by the debtor, as provided under Section 461(11), denominated as the "cram–down" provision, and Section 472 of the Act. The purpose of the "cram–down" provision is to bind affected but nonaccepting creditors to the plan of arrangement, so long as the dissenting creditors are otherwise adequately protected, Bankruptcy Act § 461(11) [11 U.S.C.A. 861(11)], and the proposed plan is for the best interests of creditors and is feasible. Section 472(2) [11 U.S.C.A. 872(2)]. Therein lies issues of litigation. The ultimate determination is merited on the facts of each individual case.

One of the debtor's contentions is that interest is not allowable on Metropolitan's security deed from the date of the filing of the Chapter case to date of confirmation. Such contention finds no support in the Act or precedents.

In the case sub judice the going concern and fair market value of the Hilton exceeds the principal and interest due Metropolitan. In such cases interest is allowed from the date of filing of the Chapter XII case to the date of payment. The post–petition interest is secured by the collateral. *Sexton v. Dreyfus*, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244; *Coder v. Arts*, 152 F. 943, 950, aff. 213 U.S. 223, 53 L.Ed. 772, 29 S.Ct. 436; *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1942) (corporate reorganization under Section 77B of the Act, and at a subsequent date was continued as a Chapter X proceeding); *In re Black Ranches, Inc.*, 362 F.2d 8 (8th Cir. 1966) (Chapter X); Remington,

---

**2.** Section 423 of the Act [11 U.S.C.A. 823].

**3.** Section 406(1) of the Act [11 U.S.C.A. 806(1)].

**4.** Section 461(1) and (3) of the Act [11 U.S.C.A. 861(1) and (3)].

312

Acceleration by Metropolitan of its payment under the terms of its security deed did not alter the rule. The Chapter XII case delayed effectuation of the nonjudicial foreclosure and the sale of the realty thereunder. Interest continues to accrue until foreclosure becomes a reality or the matter in issue is otherwise consummated, or such interest is waived. Until foreclosure, the maturity of the security deed is not affected. Metropolitan should not be penalized by being denied interest on its obligation where the value of its security exceeds the outstanding indebtedness for which the collateral was given to secure. To hold otherwise would result in irreparable financial loss to the mortgagee.

To come in under Chapter XII, the debtor must be seeking relief against at least one real estate security lienholder, with or without likewise seeking an arrangement with general creditors. Remington § 3701.

In the case sub judice, Metropolitan Life Insurance Company, holder of the first security lien, Class 5, and the unsecured creditors, Class 8, rejected the plan of arrangement. The debtor filed an application to have the arrangement confirmed under Section 461(11)(d) of the Act [11 U.S.C.A. 861(11)(d)], the pertinent part of which reads as follows:

"An arrangement—

(11) shall provide for any class of creditors which is affected by and does not accept the arrangement by the two-thirds majority in amount required under this Chapter, *adequate protection* for the realization by them of the value of their debts against the property dealt with by the arrangement and affected by such debts, either, as provided in the arrangement or in the order confirming the arrangement, ... (d) by such method as will, under and consistent with the circumstances of the particular case, equitably and fairly provide such protection...."

(Emphasis added)

For nonaccepting secured creditors, the primary requirement of a plan of arrangement is that it shall provide adequate protection for any affected class of creditors. Section 461(11), supra.

Requirements for confirmation are set forth in the Act at Section 472. The pertinent requirements thereof applicable in the case sub judice read as follows:

"The Court shall confirm an arrangement if satisfied that—

(1) the provisions of this chapter have been complied with;

(2) it is for the best interests of creditors and is feasible; ...."

The debtor contends that its plan of arrangement adequately protects Metropolitan for the value of its debt against the property dealt with by the arrangement. This contention is not supported by the evidence. To support its contention, the debtor is vying that future anticipated increases in cash flow for debt service will be through increased room rates and occupancy. The means for the execution of the plan of arrangement is based solely on the future speculative income of the Hilton. Such speculation would be at the expense of Metropolitan with the use of its capital.

Execution of the plan requires the issuance of two security instruments by the debtor—one on confirmation and the other on January 1, 1989. The plan of arrangement extends the original mortgage from its maturity date for an additional term of thirty-three years, which is beyond the economic life of a hotel of this type. No interest on the principal sum is provided for until January 1989. Interest rate proposal beginning January 1989 is eight percent compared with current interest rates of 10½ percent per annum. No payment on the principal sum outstanding is proposed until January 1989. No payments on principal or interest are proposed for the year 1979, and monthly payments proposed between 1980 through 1988 will not be sufficient to pay interest accruing over said period of time. By December 31, 1988 the total indebtedness due Metropolitan will exceed the current outstanding balance.

To support a "cram–down" under Section 461(11)(d) of the Act, supra, the burden is cast upon the debtor not only to provide adequate protection to Metropolitan, but must provide adequate means for the execution of the arrangement as required by Section 461(12) of the Act. This latter section is an implementing requirement to make the plan of arrangement feasible. The burden of proof must be by clear and convincing evidence. Cf. Bankruptcy Rule 12–43(d); *In re Murel Holding Corporation*, 75 F.2d 941 (2nd Cir. 1935); *In re Hobson Pike Associates, Limited*, 3 B.C.D. 1205.

Adequate protection is not defined by the Act. "Adequate" is defined by Webster's Encyclopedia of Dictionaries as "equal to; sufficient."

Collier on Bankruptcy addresses itself on the matter of adequate protection by stating that "Whatever means afforded by paragraphs (7) [of Section 216 of the Act, 11 U.S.C.A. 616(7), (Subchapter X)] . . . is used in dealing with nonassenting classes, it is required that dissenters must be given thereby 'adequate protection for the realization by them of the value,' . . . 'of their claims against the property dealt with by the plan and affected by such claims,' . . . . This means, the courts have said many times, that the dissenting classes must receive 'complete compensation' or the 'indubitable equivalence' of the rights they surrender under the plan of reorganization. A dissenting class may not, against its will, have its claims or interests devaluated so that it receives less than its full share of the rights it possesses in the debtor. . . ." Collier on Bankruptcy, Vol. 6A, ¶ 10.12, pp. 53, 54. Collier further states at page 85:

"It is certain, of course, that paragraphs (7) [of Section 216] . . . may not be used to effect anything other than a 'fair and equitable' plan. Nor may paragraphs (7) . . . deprive a claimant of the 'indubitable equivalence' of his rights, or result in a scaling down of senior interests for the benefit of junior interests without full compensatory treatment."

Adequate protection is incapsulated in the case of *In re Murel Holding Corpora-*

*tion*, 75 F.2d 941. *Murel* was decided in 1935 under former Section 77B(b)(5)(d) which provided: "(5) . . . adequate protection . . . (d) by such method as will in the opinion of the judge, under and consistent with the circumstances of the particular case, equitably and fairly provide such protection."

Section 216(7)(d) of Subchapter X of the Act [11 U.S.C.A. 616(7)(d)] and Section 461(11)(d) of Chapter XII of the Act [11 U.S.C.A. 861(11)(d)], supra, contains sections substantially identical as Section 77B(b)(5)(d). Subchapter X replaced former Section 77B. Cases decided under Subchapter X and formerly Section 77B are persuasive. In *Murel, supra*, the court, expounding on paragraph (d) of Section 77B(b)(5), supra, stated:

"(d) The last is not, properly speaking, a 'method' at all; it merely gives power generally to the judge 'equitably and fairly' to 'provide such protection,' that is, 'adequate protection,' when the other methods are not chosen. It is this alone which the debtors here invoke. In construing so vague a grant, we are to remember not only the underlying purposes of the section, but the constitutional limitations to which it must conform. It is plain that 'adequate protection' must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence."

In the case of *Rader v. Boyd*, 252 F.2d 585, 587 (10th Cir. 1957), Chapter XII case, the court stated: " . . . an arrangement which offers no more than a speculative venture with creditor's funds is not adequate protection for the secured creditors, and therefore not feasible within the con-

templation of the Bankruptcy Act." See *In re 750 Avenue Associates, supra.*

In the case of *In re Schwab Adams Company,* 463 F.Supp. 8, 12 (S.D.N.Y.1978), Chapter XII case, the court stated: "A requisite to confirmation of a plan of arrangement under Chapter XII is that secured creditors affected be afforded adequate protection. When the value of the mortgaged premises exceeds the amount owed on the mortgage, the mortgagee is entitled to its principal and interest.... [cases cited]. In short, in such circumstances the adequate protection afforded and required under the arrangement must be completely compensatory.... Since the plan did not provide for payment in full or its indubitable equivalent to Prudential, it could not be confirmed. See *In re Nob Hill Apartments,* 2 B.C.D. 1463 (N.D.Ga.1976); *In re Murel Holding Corp.,* 75 F.2d 941 (2d Cir. 1935). .... There is nothing to indicate that the debtor will be able ten years hence to retire the debt owed to Prudential. Such an arrangement has been held to be fatally defective because it allows the debtor to speculate with his creditor's funds. See *In re Huntley Square Associates, supra.*" 2 B.C.D. 1417 (D.Md.1976). Accord: *In re Georgetown Apartments,* 3 B.C.D. 512, 517. Cf. *In re Hobson Pike Associates, Limited, supra.*

The plan of arrangement does not provide "adequate" means to execute the arrangement so as to adequately protect Metropolitan for the realization by it of the value of its debt against the property dealt with. The debtor's plan of arrangement is wholly speculative. The debtor can be enthusiastic about tomorrow, today; but that is not sufficient. Ideas are noble, but it is mind boggling to think of the potential hazards that are probable in the future which would prevent the execution of the plan. The seeds in an apple can be counted, but the apples in a seed cannot be counted. A projection would be futile. Neither can the finite mind project future economic growth of the economy nor the necessary growth and stability of the net cash flow of the Hilton to pay debt service for a period of thirty–nine years. If the past performance of the Hilton is indicative of the future, the problems of the future can be manifested by the problems of the past. The future financial potential of the Hilton is headed into a hailstorm that appears certain to grow more tense as the energy crisis continues to exist and inflation continues to grow. The debtor's goals and realities are in conflict.

This Court is of the opinion that Metropolitan could suffer irreparable harm by delay of its nonjudicial foreclosure as the debtor's plan of arrangement is not feasible as it does not provide adequate protection to Metropolitan nor adequate means for the execution of the plan. Nor is there a reasonable likelihood of rehabilitation.

It is the opinion of this Court that the debtor's Chapter XII case should be dismissed.

The Court retains jurisdiction of the case for the purpose of setting costs and compensation for services rendered as provided by Rule 12–28.

Accordingly, an order has issued hereupon, and is attached hereto and made a part hereof.

### APPENDIX "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

In the Matter of:

MACON UPLANDS VENTURE, Debtor.

CIVIL ACTION NO. 79-200-MAC

BANKRUPTCY NO. 78-292-Mac

Filed Oct. 16, 1979

OWENS, Chief Judge:

Debtor Macon Uplands Venture has dismissed its motion for a stay of foreclosure pending appeal and has moved to dismiss its appeal. In its motion to dismiss it "submits that the *only terms and conditions* of said dismissal would be that the stay pending appeal previously granted by this court would be annulled as of the execution of the order dismissing the Appeal." (emphasis added).

Prior to filing its said motion to dismiss, debtor's attorney Charles M. Tatelbaum

verbally advised this judge that debtor intended to dismiss its appeal for the purpose of immediately commencing a new bankruptcy proceeding under the more liberal provisions of the Bankruptcy Reform Act of 1978 (effective October 1, 1979) in the United States Bankruptcy Court for the District of Maryland.[1] Being so advised this judge suggested to Mr. Tatelbaum that the debtor's intention to dismiss in this court and refile under the Bankruptcy Reform Act in the District of Maryland is contrary to the savings provisions of the Act, to wit:

"Section 403 of Pub.L. 95–598, Title IV, Nov. 6, 1978, 92 Stat. 2683, provided that:

" '(a) A case commenced under the Bankruptcy Act, and all matters and proceedings in or relating to any such case, shall be conducted and determined under such Act as if this Act had not been enacted, and the substantive rights of parties in connection with any such bankruptcy case, matter, or proceeding shall continue to be governed by the law applicable to such case, matter, or proceeding as if the Act had not been enacted.' "

*See also* 1978 U.S. Congressional and Administrative News at 5806, 5952, 6244 and 6414.

It being the clear intention of Congress that this case which was commenced under the old law and adjudged factually and legally under the old law, will proceed "as if this [Bankruptcy Reform] Act had not been enacted . . ." the sole remedy of debtor is under the provisions of the old law. If this case is dismissed, debtor will have voluntarily dismissed its only appeal of right from Bankruptcy Judge Patterson's order of dismissal and it will have no further right to proceed in this court or any other United States Court. Contrary to the language of debtor's motion the dismissal of debtor's appeal will be *with prejudice* to the right of debtor to further proceed under the bankruptcy laws of the United States, an effect greater than stated in its motion.

Because of its views this court is willing to grant debtor's motion to dismiss but only with prejudice to the right of debtor to further proceed under the bankruptcy laws–old or new–of the United States. Any other dismissal would be for an impermissible purpose and will not be granted by this court.

Debtor by 5:00 p. m., Monday, October 22, 1979, shall elect in writing filed with the clerk to either continue with its appeal or to have its appeal dismissed with prejudice to its right to further proceed under the bankruptcy laws–old or new–of the United States.

Debtor's attorney and all other attorneys shall be given immediate telephone notice of this order and a copy shall be served by United States mail.

The hearing on debtor's motion for a further stay which was to be held Thursday, October 18, 1979, at 2:00 p. m., is vacated on account of debtor's dismissal of that motion.

So ordered.

---

1. On Monday, October 15, Bankruptcy Judge Harvey M. Levowitz of the District of Maryland advised this judge that debtor's attorneys were there seeking to commence a proceeding under the Bankruptcy Reform Act.